## Hague et al. v. Wheeler et al., Appellants.

[Marked to be reported.]

*Equity—Injunction—Gas well—Waste.*

In the absence of malice or negligence in draining a well, a landowner
may permit gas to escape from it, and go to waste, if no other injury is
done to his neighbor than that which would result from the depletion of
the gas basin in which his own and his neighbor's lands are situated.

Plaintiffs, an individual and a gas company, were owners of lands in a
gas-basin, and had opened wells upon their lands from which they ob-
tained gas in quantities sufficient for commercial use.  Defendants were
owners of adjoining lands in the same basin.  At the solicitation of the
gas company, they opened wells upon their lands, but failed to obtain gas
sufficient for commercial use.  The object of the gas company in request-
ing defendants to open the wells was to purchase the land, and the wells
were opened in pursuance of a negotiation entered into for that purpose,
which afterward failed.  Defendants did not plug the wells, but permit-
ted the gas to escape and go to waste.  Plaintiffs entered upon defendants'
land, and shut in the gas and closed the well.  Defendants then threat-
ened to remove the cap, and permit the gas to escape.  Plaintiffs filed a
bill in equity to restrain them from so doing.  *Held*, (1) That as there
was no evidence that defendants had acted with malice or negligence
towards the gas company in opening the well, none could be imputed to
them as to the other plaintiff.  (2) That an injunction could not be sus-
tained.

Argued May 2, 1893.  Appeal, No. 107, Jan. T., 1893, by
defendants, N. P. Wheeler, L. R. Freeman et al., from decree
of C. P. Warren Co., Dec. T., 1892, No. 33, awarding injunc-
tion in favor of plaintiffs, W. W. Hague and Citizens Gas Co.
Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and
THOMPSON, JJ.

Bill in equity for injunction to restrain waste of gas on adjoining premises.   Before NOYES, P. J.

The bill averred that plaintiffs were lessees of about twenty-two hundred acres of land for oil and gas purposes, and that defendants were neighboring landowners.   Plaintiffs further averred as follows:

" 3. By reason of the geological formation in that locality, the gas-bearing sand-rock underlying a large part of tracts Nos. 5202, 5203, 5207 and 5208, including those parts of which the plaintiffs and defendants are lessees or owners of the gas and oil respectively, and from which the plaintiffs are producing gas in paying quantities, is subject to rapid drainage by the drilling of wells on any part thereof.

" 4. The plaintiff, Hague, began drilling wells on his leasehold in the year 1888, and the plaintiff, Citizens Gas Co., in the year 1887.   The defendants, lessees, did not drill any wells on the land in which they own the oil and gas or in the said basin until the year 1890, when they sunk one well on that part of tract number 5207 situate in Limestone township, Warren county, about fifty' rods from the leasehold of plaintiff the Citizens Gas Co., and about eighty or ninety rods from the leasehold of the plaintiff Hague, in the summer of 1890, and obtained gas in considerable quantities.

" 5. The flow of gas from the said well of defendants is so great that it will, if allowed to go to waste, seriously and irreparably injure the wells of the plaintiffs by drainage from the lands adjoining and near to said defendants' wells.   The defendants have not marketed the gas from said well, nor made any use thereof whatever, but in 1891 said well was opened and the gas permitted to escape in great quantities, and it having caught fire, the plaintiff Hague and Geo. H. Ahrens caused the same to be extinguished and shut in for the protection of their own lands, as well as to the benefit of the defendants, at the expense of about $200.   The defendants at one time offered to shut in said well and give plaintiffs control thereof for a consideration of $1,650 per annum, which plaintiffs, being greatly injured by the waste and drainage of said gas, agreed to pay; but the defendants failed to perform their agreement, and in September, 1892, sent men to open said well and allow the gas to escape in great quantities, and declared their inten-

tion to open said well unless plaintiffs would pay them an extortionate and exorbitant price therefor. Said defendants are still threatening to open said well, and if done the drainage of gas from the territory of plaintiffs will be such as to cause them great and irreparable damage. And your orators are informed and believe that on the 25th day of October, 1892, the said defendants again opened said well and intend to keep the same open.

" 6. The said acts and threats of the defendants, your orators aver, are contrary to law and equity, and injurious to them and to the public."

The bill prayed for an injunction (1) to prevent the opening of defendants' well, so as to prevent the gas from going to waste, and (2) general relief.

The court granted a preliminary injunction, and subsequently refused to take it off, in the following opinion by NOYES, P. J.:

" The plaintiffs, W. W. Hague and the Citizens Gas Company, are lessees for oil and gas purposes of certain lands lying in this and the adjoining county of Forest; the defendants, Watson, Freeman and Syms, are lessees, or owners, of the oil and gas in certain other lands lying near those in which the plaintiffs are interested; since 1887 and 1888 respectively the plaintiffs have been producing and marketing natural gas upon their respective premises in paying quantities; in 1890 the defendants caused a well to be drilled upon their premises which produced gas in large quantity, but they never have used or marketed the same; in 1891 the derrick at this well was destroyed by fire, and the gas escaped into the air; the defendants refusing or neglecting to shut it in, the plaintiffs did so at their own expense, and the well remained in this condition until shortly before the present application. The allegations of the bill that the defendants agreed to shut in the well and put it under the control of the plaintiffs in consideration of $1,650 per annum, and that they threatened to keep the well open unless paid an exhorbitant price, are expressly denied in the affidavit of Mr. Freeman, and we lay them out of view. At the time the bill was drawn, the defendants had given directions to have the well opened, and at the time of the hearing it was conceded that it was, in fact, open and on fire, the gas thereby going to waste.

" The only answer to the plaintiffs' allegations thus far made is the affidavit of Mr. Freeman, before referred to. It denies that the injury to the plaintiffs will be serious, or irreparable, but gives no facts bearing upon the matter, and states the affiant's belief that the plaintiff Hague has no interest in the leases set out in the bill. These averments are too indefinite to defeat the right of the plaintiff to an injunction, especially in view of the conceded fact that the granting of such an order will work no pecuniary loss to the defendants, while its refusal will inflict great loss upon the plaintiffs, if in fact they are entitled to such relief. The positive statement in the affidavit that the acts of the defendants now complained of had been invited by the Citizens Gas Company through its president might defeat this application so far as that company is concerned, but as it cannot affect the plaintiff Hague, it is not necessary to consider it at this time.

" I am obliged therefore to consider this application upon the merits of the case, leaving out of view any contractual relations between the parties, and regarding only their respective rights and duties as adjacent owners of oil and gas. For the purposes of this case they may be treated as owners of the land itself.

" The mere fact that the defendants by operations upon their land are taking gas from the earth, and thereby diminishing the quantity of gas which would otherwise come to the plaintiffs' wells furnishes no ground for complaint, or equitable interference, and this is freely conceded. .If the plaintiffs have any right, it rests upon the fact that the defendants are not taking gas in the ordinary course of mining, or for purposes beneficial to themselves, or others, but are permitting it to go to waste. Malice is not expressly alleged in the bill, but the facts disclose no possible motive for so doing except a purpose of diminishing the amount which the plaintiffs will get through their wells, though the natural inference would be that the defendants are not actuated by feelings of malevolence towards the plaintiffs, but are seeking, through their power to injure, to secure a better bargain.

" The questions thus presented for my determination on this preliminary application are of great importance and delicacy, and, so far as I am advised, have never been determined in any

court.   I regret that I am obliged to decide without the aid of
adequate and thorough argument, such as the able counsel rep-
resenting the respective parties could have made, had they
not been prevented by the emergency of their case.   I have,
however, examined every authority bearing upon the case which
I have been able to find, and will state the conclusions to which
they lead my mind.

" If the defendants have a right to take gas from their well
in unlimited quantities for their own profit, how far is their
right affected by the fact, if it be a fact, that their motive in
taking it is not profit, but injury to another—malice, in the le-
gal sense ?

" There are many dicta and some authorities which seem to
declare that an act done in the exercise of a lawful right, and
without negligence, may be unlawful if done with express mal-
ice.   Prominent among these is the carefully considered case
of Wheatley v. Baugh, 25 Pa. 532, in which the rule of the civil
law is cited with approval by C. J. LEWIS, to the following
effect: ' He who, in making a new work upon his own estate,
uses his right without trespassing either against any law, cus-
tom, title or possession which may subject him to any service
towards his neighbors, is not answerable for the damages which
they may chance to sustain thereby, unless it be that he made
that change with a view to hurt others without any advantage
to himself.'   The same doctrine is approved in Haldeman v.
Bruckhart, 45 Pa. 514, in Penn. Coal Co. v. Sanderson, 113 Pa.
148, and other cases.   The suggestion that one may not do
maliciously what he might lawfully do if his motives were good
is found in many English cases, among which are Acton v.
Blundell, 12 M. & W. 338; and Chasemore v. Richards, 7
House of Lords Cases, 387.   It has been more or less clearly
made in the following, among other cases, in other states of this
Union : Greenleaf v. Francis, 18 Pick. 117 ; Roath v. Driscoll,
20 Conn. 533 ; Carson v. Western R. R. Co., 8 Gray, 423 ;
Howland v. Vincent, 10 Metc. 371 ; Brown v. Illius, 25 Conn.
583 ; Gallagher v. Dodge, 48 Conn. 389.   I have not been able
to find any case, however, in which a party has been actually
held to liability on this ground alone.

" On the other hand there are many cases in which malice
as a criterion of liability for civil damages is distinctly repudi-

ated, and among those our own cases of Covanhovan v. Hart, 21 Pa. 495; Jenkins v. Fowler, 24 Pa. 308; Fowler v. Jenkins, 28 Pa. 176; and Glendon Iron Co. v. Uhler, 75 Pa. 467. ' Malicious motives,' says BLACK, J., in Jenkins v. Fowler, ' make a bad act worse; but they cannot make that wrong which in its own essence is lawful. . . . As long as a man keeps himself within the law by doing no act which violates it, we must leave his motives to him who searches the heart.' To the same effect are Mahon v. Brown, 13 Wend. 261; Clinton v. Myers, 46 N. Y. 511; Phelps v. Nowlen, 72 N. Y. 39; South Royalton Bank v. Suffolk Bank, 27 Vt. 505; Chatfield v. Wilson, 28 Vt. 49.

" Without lengthening out this opinion by pointing out the distinctions between these cases, it is enough to say that my mind inclines strongly to the conclusion that the presence or absence of malice cannot of itself determine the liability of an owner of land for an act done upon it. If the act is lawful when done with innocent intentions, it is no less so because the motives were bad. If these defendants might lawfully drill a hole into the gas bearing rock and suffer the valuable gas to escape because they foolishly, but honestly, believed that the use of natural gas is an injury to mankind, they may do so for the purpose of keeping their neighbor from getting it, even if the motive is purely malevolent. Such in my opinion is the weight of the authorities, as well as the reason of the case.

" But this assumes that the act done with malicious intent invades no legal right of another. The cases are all of this character, or were so regarded by the courts deciding them. On the other hand the cases which seem to announce a different doctrine deal with rights which are not absolute and exclusive, but qualified and correlative. An example of the former is Fowler v. Jenkins, supra, in which the action was brought for maliciously tearing down a fence which neither the plaintiff nor the defendant had a right to maintain; of the latter is Greenleaf v. Francis, in which the action was brought for digging a well so near the plaintiff's well as to divert the water. The instructions of the trial court to the jury, which were indorsed by the appellate court, were: ' That if the defendant had a legal right to dig a well upon any part of his own land for the purpose of obtaining water for his own use; that if he dug his own well where he did for that purpose, he was justified

in so doing, although the effect might be to diminish the water in the plaintiff's well; that if he dug where he did for the purpose of injuring the plaintiff, and not for the purpose of obtaining water for his own use, he was liable in this action; but if he thus dug his well for the purpose of accommodating himself with water he was not liable for so doing, even if he at the same time entertained feelings of hostility towards the plaintiff and a desire to injure her, and these feelings were thereby gratified.'

" Malice implies knowledge. If the defendant in the case above cited dug his well maliciously, he knew beforehand where to dig to tap the same subterranean stream from which the plaintiff's well was supplied. His right in such waters was qualified by the right of the plaintiff in the same flow of water. He could use it without stint, even if it exhausted the plaintiff's well, but he could not wantonly destroy it, nor take it not for use, but merely to injure his neighbor. Malice in such a case is not the criterion of liability, but it is an index which clearly shows an overstepping of the line, otherwise difficult to trace, between the respective rights of the parties. The true place of malice in such inquiries is clearly defined by the court in Chatfield v. Wilson, above cited, in the following paragraph from the opinion of the court: ' There are many cases in the books relating to the relative use of surface streams, where the case has turned upon the question whether the use was reasonable, and for the party's own convenience or benefit, or wanton and malicious and done to prejudice the rights of another. In such cases there are correlative rights to the use of the water, and the boundary of the right is a reasonable use of it.'

" Respecting rights in water I find the following from the pen of Judge Cooley in the Southern Law Review (reprinted Alb. L. J., vol. 14, p. 63), which though not delivered ex cathedra, is none the less dispassionate and sensible: ' There seems to be some difficulty in laying down a rule for these cases that will be quite satisfactory in principle and in its workings. That a man may lawfully make an excavation on his premises for the sole purpose of drawing away the water from his neighbor's well and rendering it useless, seems to be, and is, in fact, a monstrous doctrine. On the other hand it cannot be said, consistent with the authorities, or perhaps with reason, that adjoining pro-

prietors have rights in the water percolating the soil corresponding to those they may have in a running stream which crosses their several estates.   Such a rule would raise questions of reasonable use, and create difficulties both of evidence and of application that would make the right to such waters more troublesome than valuable.   The courts have doubtless been right in declaring that one proprietor cannot insist on another keeping his estate as a filter for the use of the former, nor be heard to complain if the use by his neighbor of his own estate draws off the secret particles of water which otherwise he might have gathered.   These waters belong to no one until they are collected, and they may be appropriated by the one who collects and puts them to use.   But though neither proprietor has such a right in or control over the water as will enable him to complain of his neighbor's appropriation, does not each owe to the other certain duties of good neighborhood, among which is the duty to abstain from purposely withdrawing the water that may be useful to both, when a use of it is not intended?   Conceding that he may collect it for use, does this entitle him to do so not for use, but of malice?   If he sinks a well to supply his house, or water his stock, it must be admitted that no question can be raised whether this is, or is not a reasonable appropriation of the water; but if he digs a hole to injure his neighbor, it is not perceived that the two cases are necessarily to be governed by the same rule.   What is a man's right to water percolating through the soil?   The just answer seems to be this: It is a right to gather and appropriate it to his lawful uses.   When he does this he is exercising his right, and his motive is not open to inquiry.   But when he collects it, not for use, but to injure his neighbor, he exceeds his right, and there is that conjunction of wrong and injury which constitutes a tort and will support an action.'

" In most of the cases malice and negligence are coupled together, and, in respect to the rights of the party injured, it would seem that liability would result from one in any case where it would from the other.   No matter how negligently an act may be done, it creates no liability unless some legal right of another is injuriously affected; the same is true of an act done maliciously, and the converse holds in both cases.   And where the right of one to do an act is limited by any qualifica-

tion, it must be held to stop short of a right to do it from pure malice.

" What, then, are the rights of adjoining owners of oil and gas ? Are they absolute and independent, or qualified and correlative.

" These valuable products are obtainable only in connection with the ownership of land and for many purposes are to be regarded as minerals, and as constituting an integral portion of the land itself. Funk v. Haldeman, 53 Pa. 229 ; Stoughton's Appeal, 88 Pa. 198. But they are not, like coal and iron ore, fixed in their place in the rocks, so that the owner may know his own, protract his lines downwards to mark his boundaries, and take them when he pleases. As water percolates by untraceable rills through the gravel, so these ' minerals feræ naturæ,' as they have been aptly called in a recent case, permeate the porous rocks deep in the bowels of the earth, and rush to the surface through any opening made through the impervious cap by which the basin which contains them is sealed. No landowner gets through his wells oil or gas exclusively from his own land; that which saturates his rocks may be lawfully taken by his neighbor through wells on his land, tapping the common reservoir. From the very nature of the case the right of each owner is qualified. It is common to all whose land overlies the basin, and each must of necessity exercise his right with some regard to the rights of others.

" Notwithstanding the fugitive nature of oil and gas, I think it will not be doubted that if a party by negligent operations upon adjacent land injures the flow of oil wells, as, for example, by neglecting to case off the fresh water, he would be liable in damages to the well owners so injured ; such a liability as to wells of water was established in Collins v. The Chartiers Gas Co., 131 Pa. 143, and the right to gas or oil would seem to be of as high a character as the right to water. If the owner of gas wells, or land, has such an interest in the gas that he can recover for an injury done by negligence, he surely may when it is done of deliberate purpose.

" The same considerations of natural justice which limit the ownership of running water to the usufruct, and of percolating waters to their use in a broader sense, must of necessity impose qualifications upon the enjoyment of all rights of property,

which, from the nature of the things possessed, many must enjoy together. The owners cannot be permitted to carry on their operations in lawless irresponsibility, but must submit to such limitations as are inevitable to enable each to get his own. The fact that these limitations are not found clearly defined in the books is no proof that they do not exist. The common law is a growing tree; its principles must be continually adapted to new facts, and the changing conditions of modern life. Only the legislature can grub it up, but the courts are charged with the duty of pruning its branches, and sometimes grafting a new scion on the old stock.

"I concede that the defendants may lawfully take as much gas as they can get by wells drilled upon their land, and apply it to any useful purpose, though with an avowed intention of destroying the plaintiffs' wells by so doing, and a malicious pleasure in the act. But their well in its present condition is not a means of obtaining gas for any purpose. It is a mere conduit by which the gas imprisoned in the rocks is enabled to escape into the atmosphere. All who have proved their ability to obtain gas from that reservoir are interested in common in its preservation, and the reckless waste of it is an injury to all. Whatever other qualifications may attach to the landowner's right, it seems to me clear that it must of necessity be limited to legitimate operations for profit—not malice—and by the requirement of ordinary care for the protection of others interested in common with himself.

"I am aware that the conditions attending the production and sale of natural gas are peculiar. There may be cases where the wasting of gas seems to be the only alternative to permitting another to take it without compensation. How far a court of equity would be influenced by such considerations, it is not necessary now to decide, for no such facts appear in this case at present. Upon the whole case I am of opinion that the injunction should be continued.

"And now, Nov. 5, 1892, on hearing and due consideration, the plaintiffs having filed a bond in the sum of $2,000, with sureties approved by the court, the same is ordered to be substituted for the bond given on issuing the injunction, and the injunction heretofore granted is continued until further order."

*Error assigned* was decree, quoting it.

*D. I. Ball, C. C. Thompson* with him, for appellants, Caroline E. Watson, Parker Syms and Chas. Chase.—Waste is defined to be the destruction or improper deterioration or material alteration of things forming an essential part of the inheritance done or suffered by a person rightfully in possession by virtue of a temporary or partial estate, as, for example, a tenant for life or for years: Grubb's Ap., 90 Pa. 228.

Plaintiffs' right to the gas under their leasehold is to so much gas only as may be obtained through the well or wells or opening upon the land owned by them, or embraced within the boundaries of their leasehold: Westmoreland N. Gas Co. v. Dewitt, 130 Pa. 235; Duffield v. Rosenzweig, 144 Pa. 537.

The owner is defined to be he who has dominion of a thing, real or personal, corporeal or incorporeal, which he has a right to enjoy or to do with as he pleases,—even to spoil or destroy it, as far as the law permits, unless he is prevented by some agreement or covenant which restrains his right: 2 Bouv. L. Dict. 343; Anderson's Dict. 741; 1 Bl. Com. 138.

The owner of the land may maintain an action of trespass for the injury to his close, but there the remedies which the law allows end: Angell on Water Courses, p. 12; Race v. Ward, 82 E. C. L. 700; Haupt's Ap., 125 Pa. 224; Mayor v. Commissioners, 7 Pa. 348; Phila. v. Collins, 68 Pa. 116; Kitchen v. Smith, 101 Pa. 452.

The established principle of the common law, that a man's ownership of land covers all the land inclosed within vertical lines drawn from the boundaries of his property to the centre of the earth, makes the owner of the land the owner of the oil and gas which is contained therein, and of water that percolates therein.

*W. M. Lindsey, J. O. Parmlee* with him, for appellant, L. R. Freeman.—Natural gas, like petroleum oil, coal and iron ore, is a mineral, and belongs to and is part of the realty: Funk v. Haldeman, 53 Pa. 229; Stoughton's Ap., 88 Pa. 198; State v. Indiana & Ohio Oil, Gas & Mining Co., 120 Ind. 575.

The rights of the owner of the land to the water which percolates, or filters through the soil are not qualified, as they are

in streams which flow upon the surface of the earth, and well defined water courses which flow under the earth, but are absolute : Acton v. Blundell, 12 M. &, W. 324 ; Chasemore v. Richards, 2 H. & N. 168 ; Greenleaf v. Francis, 18 Pick. 117 ; Roath v. Driscoll, 20 Conn. 533 ; Wilson v. New Bedford, 108 Mass. 261 ; Wheatley v. Baugh, 25 Pa. 528 ; Chatfield v. Wilson, 28 Vt. 49 ; Frazier v. Brown, 12 Am. L. Reg. O. S. 294 ; Chase v. Silverstone, 62 Me. 175 ; Delhi v. Youmans, 50 Barb. 316 ; Ellis v. Duncan, 21 Barb. 230 ; Angell on Water Courses, 7th ed., 174 ; Brown v. Illius, 25 Conn. 583.   The same rule applies with still greater force to natural gas, which belongs to and exists in the earth.

If the analogy between natural gas and percolating water holds good, then the conclusions of the learned court below in holding the rights of the owners in natural gas to be qualified and correlative, are against the uniform decisions of the courts in England and this country, with the exception of New Hampshire : Westmoreland Gas Co. v. Dewitt, 130 Pa. 235.

The presence or absence of malice cannot of itself determine the liability of an owner of land for an act done upon it : Covanhovan v. Hart, 21 Pa. 495 ; Jenkins v. Fowler, 24 Pa. 308 ; Fowler v. Jenkins, 28 Pa. 176 ; Glendon Iron Co. v. Uhler, 75 Pa. 467 ; Mahon v. Brown, 13 Wend. 261 ; Clinton v. Myers, 46 N. Y. 511 ; Phelps v. Nowlan, 72 N. Y. 39 ; South Royalton Bank v. Suffolk Bank, 27 Vt. 505 ; Chatfield v. Wilson, 28 Vt. 49.

The conclusions of the learned judge in granting the injunction rest solely upon the ground that defendants are not taking the gas for any useful purpose.   In this, again, the court is not supported by the weight of authority or by any adjudicated case : Mahon v. Brown, 13 Wend. 261 : Phelps v. Nowlen, 72 N. Y. 39 ; Auburn Plank Road Co. v. Douglas, 9 N. Y. 444 ; Chatfield v. Wilson, 28 Vt. 49 ; Frazier v. Brown, 12 Ohio St. 294 ; Haldeman v. Bruckhart, 45 Pa. 514 ; Pickard v. Collins, 23 Barb. 444 ; Westmoreland Gas Co. v. Dewitt, 130 Pa. 235.

There can be no invasion of any legal right of the plaintiffs until they have reduced the gas to their possession : Westmoreland Gas Co. v. Dewitt, 130 Pa. 235.

The " fugitive and wandering character " of gas, as defined by AGNEW, C. J., in Brown v. Vandergrift, 80 Pa. 145, does

not in the least militate against the argument that the right of the owner of the soil to it is absolute so long as it remains in his land and is subject to his control.

*Roger Sherman* and *W. W. Wilbur*, *Samuel Grumbine* with them, for appellees.—Defendants stand upon what they say is a right, cold and naked, to drill a well upon their own land, in close neighborhood to that of plaintiffs, drain the gas from their own land and waste it, and at the same time waste that of plaintiffs, depriving them of the sale of it, and the public of its use, and doing themselves no good whatever by such conduct. This, we say, is a development of human selfishness and malice beyond what the law permits.

Where a man uses his own property in the usual manner, in the natural way, and without negligence or malice, and an injury results to his neighbor, for such injury there can be no remedy.    But it will be observed that in all these cases the use must be proper, ordinary and natural, and the damage must be unavoidable, that is, resulting solely from the lawful use of one's own : Collins v. Chartiers Gas Co., 131 Pa. 143; Penna. Coal Co. v. Sanderson, 113 Pa. 126.

The opinion of the court below contains an ample discussion of the question and citation of authorities.

OPINION BY MR. JUSTICE WILLIAMS, October 2, 1893 :

The learned judge of the court below was quite right in saying that the questions raised in this case "are of great importance and delicacy, and have never been determined in any court."    The production of oil and gas in this state has furnished many questions " of great importance and delicacy," that were new, and required to be considered and determined upon facts that were never dreamed of by the sages of the common law.

In the treatment of this case it is a matter of first importance to get a clear apprehension of the facts on which the questions are raised.    There are two plaintiffs who join in the bill whose interests, while like in kind, are nevertheless several and distinct.    There are several defendants but their interests appear to be joint.    The two plaintiffs hold separate leases on parts of tracts in Warren and Forest counties, Nos. 5202, 5203,

5207, and 5209, aggregating about 2200 acres. The gas company began drilling on its leases in 1887. Hague began in 1888. Each has a gas well or wells furnishing gas in sufficient volume to enable the owner to utilize it by transportation to and sale in towns in the vicinity. The defendants are owners and lessees of part of tract No. 5207, which adjoins the lands of the gas company and is not far from the lands of Hague. In 1890 they drilled a well on their tract and obtained gas in considerable volume, but not sufficient to enable them to utilize it by transportation and sale. They have therefore allowed it to escape into the open air. The plaintiffs allege that the " geological formation in that locality " is such, that the gas-bearing sand-rock underlying all these tracts and forming the common reservoir or deposit from which the gas is obtained, " is subject to drainage by the drilling of wells on any part thereof." For this reason they assert that " the flow of gas from the said well of defendants is so great that it will, if allowed to go to waste, seriously and irreparably injure the wells of the plaintiffs by drainage from the lands adjoining and near to said defendants' wells.

To prevent this they state that they entered on the defendants' land, and at a cost of about two hundred dollars shut in the gas and closed the well. The defendants then threatened to remove the cap or plug and permit the gas to escape again into the air. Upon these facts the plaintiffs asked the court below to enjoin the defendants from removing the cap or plug from the casing or tubing in the well, and from " permitting the gas therefrom to flow into the air or otherwise go to waste." The injunction was granted, and from that decree this appeal was taken.

The affidavits show that the defendants drilled their well in 1890 at the suggestion and request of the gas company, and that negotiations for its purchase by the gas company have been conducted at some length but without resulting in a bargain. This fact, that the well in controversy had been drilled at considerable cost by the defendants at the request of the gas company, the learned judge rightly regarded as a significant one. In the opinion filed by him, which is an able one, he says that this fact " might defeat this application so far as the gas company is concerned; " but he regarded it as of no conse-

quence so far as the other plaintiff was concerned, for he immediately added " but as it cannot affect the plaintiff Hague it is not necessary to consider it at this time." He then proceeds to state and consider the question on which his decree was based, upon a state of facts such as might arise where an adjoining owner was guilty of malice or negligence in the conduct of operations on his land resulting naturally in injury to his neighbor. But is this conclusion of the learned judge that Hague stood on higher ground than the gas company a correct one ? The acts complained of were the drilling of the well in 1890 when the wells of both the plaintiffs were in full operation, and the subsequent failure to utilize or shut in the gas. The drilling of the well was accounted for, and the suggestion of malice or negligence therein negatived by proof that it was done at the instance of the gas company.

This company had a considerable gas plant, and was engaged in the supply of gas to its customers for fuel. It was interested in the development of the region, and evidently expected to buy the defendants' well if it was of sufficient size to be capable of utilization. The defendants and the gas company could not agree upon the price of the well after it was drilled; but the fact that it was drilled at the request of the company and not of the mere motion of the defendants was an answer to any allegation of malice or negligence on the part of Hague as well as on the part of the company, since it accounted for the act of drilling by assigning a motive therefor both lawful and neighborly. It will not do to say that an act, thus accounted for as to one plaintiff, may be assumed to be the result of malice or negligence as to the other, in the absence of proof to sustain the assertion. These plaintiffs stand on common ground. Neither of them can complain of the defendants for the act of drilling the well on their land on any other ground than the existence of malice or negligence, and when the act is accounted for in such a manner as to show that it was not done with malice, or in negligence, but in good faith, as an act of ownership and at the solicitation of the gas company, the character of the act is established, and as a basis of relief it falls out of the case. What have we then ? Three landowners owning considerable holdings in the same basin or overlying the same gas-bearing sand-rock, each having an open gas well or wells on his land,

drilled without malice or negligence, in a lawful manner and for a lawful purpose. Two of these owners have been able to utilize the gas from their respective lands and find a market for it. One of them has not been so fortunate. He has gas from his well, but, up to the time of the filing of this bill, he has not been able to utilize or dispose of it, and his gas has gone to waste for that reason. His more fortunate neighbors come into a court of equity and ask that he shall not be permitted to let his gas run, because, while this gas is his own, underlying his tract, and finding its way to the surface through his well, it has a tendency to drain the sand-rock and so to reduce ultimately the flow of gas from their wells. This would be equally true if the defendants were able to utilize their gas; yet it is conceded that in that case their right to the gas from their well would be as incontestable as the right of the plaintiffs to use the gas from theirs. How is that right lost? By their inability to find a purchaser? If they can find a purchaser, or turn the gas to any useful purpose, their right to the gas that flows from their well is conceded. If they cannot, their right is denied. Their well must be shut in, while their successful neighbors drain the entire basin, through their open wells, and receive pay for the gas. This is a proposition to limit the power of the owner over his own by the use he is able to make of it. If he can sell his gas or his oil, or turn it to some practical purpose, his power over it as owner is unabridged. If he cannot find a purchaser, or a practical purpose to which to apply his yield of gas or oil, then his power as owner is gone. This would be an adaptation to actual business of the spiritual truth that " to him that hath shall be given, but from him that hath not shall be taken away even that which he seemeth to have."

Does the maxim, *sic utere tuo ut alienum non laedas,* require us to grant the relief sought in this case? If in burning the gas from their well the defendants should direct the jet towards the plaintiff's buildings or timber, or should leave it uncontrolled so that the wind might drive it against or towards the plaintiff's property so as to injure or endanger it, a case would be presented in which the maxim would be applicable and we should take pleasure in enforcing it. If the defendant's well produced nothing and they were leaving it without plug-

ging so that the water might find its way into the sand-rock to
the injury of others, we could punish them under the statute
which prescribes the manner of plugging an unproductive well,
and makes it obligatory on the owner to adopt it.  But we have
a well drilled for a lawful purpose, in a lawful manner, and
actually producing gas which is not directed towards the prop-
erty of another, or so consumed as to affect the buildings, tim-
ber, or crops of any adjoining owner.  It is therefore not the
use of the gas of which the plaintiffs complain.  It is the pro-
duction of it, when the owner cannot sell it or turn it to any
practical purpose.

Now it is doubtless true that the public has a sufficient inter-
est in the preservation of oil and gas from waste to justify leg-
islation upon this subject.  Something has been done in this
direction already by the acts regulating the plugging of aban-
doned wells; but it is not the public interest that is involved
in this litigation.  It is the interest of an adjoining owner who
seeks to appropriate to himself so much of his neighbor's gas
as he cannot turn into money, or use for some practical busi-
ness purpose, and he asks a court of equity to hold his neighbor's
hands by an injunction until this appropriation is accomplished.
We cannot find any rule of law, or any principle of equity, on
which such an injunction can rest.  The scope of the golden
rule may be sufficiently ample to cover this case; and it may
be that it would require an owner to surrender to his neighbor
so much of his own property as he could not turn to his own
advantage, if his neighbor was so situated that he could profit
by it.  Assuming this to be so, the moral obligation so arising
is not enforceable by civil process.  The owner of timber may
pile it in heaps and burn it, as was done in the early settlement
of the country, notwithstanding the fact that his neighbor has a
sawmill and all the facilities for preparing the sawed lumber
for market and converting it into money.  The power of the
owner of the timber over it is neither greater nor less because
of his neighbor's readiness and ability to market it.  An owner
of land may have a deposit of coal under some portion of it so
small in extent, or with such an inclination, as to make it im-
possible for him to mine through his own tract without a greater
cost to him than the value of the mined coal when brought to
the surface.  His neighbor may have an open mine that reaches

it, and through which it could be brought at a fair profit. These circumstances do not affect the title of the owner of the coal, or confer any right on the adjoining mine owner.    But it is said that the oil and gas are unlike the solid minerals, since they may move through the interstitial spaces or crevices, in the sand-rocks in search of an opening through which they may escape from the pressure to which they are subject.    This is probably true.    It is one of the contingencies to which this species of property is subject.    But the owner of the surface is an owner downward to the centre, until the underlying strata have been severed from the surface by sale.    What is found within the boundaries of his tract belongs to him according to its nature.    The air and the water he may use.    The coal and iron or other solid mineral he may mine and carry away.    The oil and gas he may bring to the surface and sell in like manner to be carried away and consumed.    His dominion is, upon general principles, as absolute over the fluid, as the solid minerals. It is exercised in the same manner, and with the same results. He cannot estimate the quantity in place of gas or oil as he might of the solid minerals.    He cannot prevent its movement away from him, towards an outlet on some other person's land, which may be more or less rapid, depending on the dip of the rock, or the coarseness of the sand composing it; but so long as he can reach it and bring it to the surface, it is his absolutely, to sell, to use, to give away, or to squander, as in the case of his other property.    In the disposition he may make of it he is subject to two limitations.    He must not disregard his obligations to the public.    He must not disregard his neighbor's rights. If he uses his product in such a manner as to violate any rule of public policy or any positive provision of the written law, he brings himself within the reach of the courts.    If the use he makes of his own, or its waste, is injurious to the property or the health of others, such use or waste may be restrained, or damages recovered therefor; but, subject to these limitations, his power as an owner is absolute until the legislature shall, in the interest of the public as consumers, restrict and regulate it by statute.

The decree of the court below is reversed and the injunction is dissolved.