905 A.2d 471

In re ESTATE OF Robert H. QUICK.

Appeal of Robert H. Quick II, Executor of the Estate
of Robert H. Quick, and Robert H. Quick II,
Individually and Richard M. Quick.

Supreme Court of Pennsylvania.

Argued Sept. 9, 2003.

Decided Aug. 23, 2006.

486

George A. Conti, Esq., Greensburg, for Robert H. Quick, II.

Sean Cassidy, Esq., Greensburg, for Marilyn Bean Jeffers.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice EAKIN.

We granted allowance of appeal to determine whether a joint tenancy with right of survivorship (JTWROS) was severed by execution of an oil and gas lease. We conclude the parties intended the JTWROS to remain intact when the oil and gas lease was executed; accordingly, we affirm the Superior Court's decision.

In July, 1957, A. Frank Jones and Grace A. Jones, by general warranty deed, conveyed fee simple title to approximately 23 acres of land in Loyalhanna Township, Westmoreland County, to Kenneth Quick, Robert Quick, and Robert Bean as JTWROS; the deed was recorded in October, 1957. On December 26 of the same year, the three joint tenants and their wives executed an oil and gas lease with respect to the property in favor of William and Marcus Seanor; the lease was recorded March 18, 1958.[1] Kenneth Quick died April 27, 1972, and title to the property vested in Robert Quick and Bean as the surviving JTWROS.

On June 14, 1979, Bean executed an oil and gas lease on the property in favor of Paul H. Gerrie & Associates, Inc. On September 15, 1979, Quick gave a similar oil and gas lease to Gerrie. Both leases were recorded September 20, 1979, assigned by Gerrie to Largent Investments May 15, 1980, and further assigned to Loyalhanna Drilling Program February 3, 1981.

---

1. Bean executed an Affidavit of Non–Development covering this lease May 5, 1980, and recorded it three days later. This affidavit vitiated the 1957 lease.

The leases Bean and Quick executed are identical, except the Bean lease contains a type-written addition that states: "Should any question of property ownership or royalty dispursements [sic] arise, the Lessor has agreed to accept full responsibility." Bean Lease at Original Record, Exhibit E to Item 29 (Petition for Declaratory Judgment), at 2. The Quick lease does not contain this clause. Quick Lease at Original Record, Exhibit F to Item 29 (Petition for Declaratory Judgment), at 2.

Drilling commenced, and all royalties were paid to Bean and Quick—each received one-half of one-eighth (one-sixteenth) of the royalties from the drilling. This continued until Quick died September 25, 1981; after that date, the royalties were paid in the same amount, one-sixteenth each to Bean and the Estate of Quick. By deed dated June 29, 1992, recorded July 6, 1992, Bean, through his attorney-in-fact, appellee Marilyn Bean Jeffers, transferred the property to appellee. Since 1992, one-sixteenth of the royalties have been paid to appellee, and one-sixteenth of the royalties have been held in escrow pending resolution of the ownership of the interest that belonged to Quick.

In April, 1993, appellee filed a petition for a citation, alleging title to the property vested in Bean upon Quick's death. Petition for Citation at Original Record, Item 18, at 4–5. She requested the court require the executor of Quick's estate to account for funds received as royalties under the lease and distribute them to her, and to order Loyalhanna Drilling Program to pay over the royalties held in escrow. *Id.,* at 8–9. Robert H. Quick, II, as executor of the Estate of Quick, as well as Robert H. Quick, II and Richard M. Quick individually, Robert Quick's sons and heirs (appellants), filed an answer and counterclaim alleging the JTWROS between Bean and Quick was severed by Bean's June 14, 1979 oil and gas lease to Gerrie, and therefore title to the property did not vest in Bean upon the death of Quick, since Bean and Quick held the property as tenants in common.

■■■ At an April, 2001 hearing, appellee and appellants submitted stipulated facts and petitioned the court to declare whether the JTWROS was terminated by the 1979 leases. The court determined the 1979 leases did not sever the JTWROS, and thus, by operation of law, Bean became the sole owner of the property upon Quick's death. Appellants appealed to the Superior Court, which affirmed the trial court's decision. Appellants petitioned this Court for allowance of appeal, which we granted, limited to the following issue:

> Did the conveyance by Robert J. Bean of his one-half interest in and to the oil and gas estate sever the joint tenancy with rights of survivorship then existing between Robert J. Bean and Robert H. Quick?

*In re Estate of Quick,* 572 Pa. 468, 817 A.2d 473 (2003) *(per curiam).* As with all questions of law, our standard of review is *de novo,* and our scope of review is plenary. *Straub v. Cherne Industries,* 583 Pa. 608, 880 A.2d 561, 566 n. 7 (2005).

■■■ When two or more persons hold property as JTWROS, title to that property vests equally in those persons during their lifetimes, with sole ownership passing to the survivor at the death of the other joint tenant.[2] *In re Parkhurst's Estate,* 402 Pa. 527, 167 A.2d 476, 478 (1961). In contrast, a tenancy in common is an estate in which there is unity of possession but separate and distinct titles. *In re Sale of Property of Dalessio,* 657 A.2d 1386, 1387 n. 1 (Pa.Cmwlth. 1995). The essence of a JTWROS is the four unities: interest, title, time, and possession. *General Credit Co. v. Cleck,* 415 Pa.Super. 338, 609 A.2d 553, 556 (1992). A JTWROS must be created by express words or by necessary implication, *Thompson,* at 771, but there are no particular words which must be used in its creation. *Maxwell v. Saylor,* 359 Pa. 94, 58 A.2d 355, 356 (1948). In fact, courts have found the intent to create a JTWROS trumps the use of imprecise or improper language in creating it.

---

**2.** While JTWROS has been said to be disfavored in Pennsylvania, *see Pennsylvania Bank and Trust Co. v. Thompson,* 432 Pa. 262, 247 A.2d 771, 771–72 (1968), it is a legitimate and permissible means by which individuals hold title.

In *Thompson,* property was conveyed to two brothers by deed as "tenants by the entireties." *Thompson,* at 771. Since tenancy by the entireties is reserved for ownership by a husband and a wife, this Court determined the brothers held the property as JTWROS in order to effectuate the conveyor's intent of creating a right of survivorship. *Id.,* at 772.

In *Maxwell,* two unmarried people were designated husband and wife on a deed, which would convey the land as tenants by the entireties if they had been married. *Maxwell,* at 355–56. Again, this Court determined the parties desired to establish a right of survivorship, and in order to give meaning to that intent, concluded the unmarried man and woman were JTWROS. *Id.,* at 356.

In *Zomisky v. Zamiska,* 449 Pa. 239, 296 A.2d 722 (1972), a father conveyed title in land to himself and his son "as joint tenants and as in common with the right of survivorship." *Id.,* at 723. Following the father's death intestate, the deed was challenged because the phrase "right of survivorship" conflicted with the concept of tenants in common. This Court found the deed created a JTWROS, because to find otherwise would render the phrase "right of survivorship" meaningless. *Id.,* at 724.

In each of the cases cited above, this Court considered the intent of the parties to determine the type of tenancy established. As we previously explained:

> [W]here there is any doubt or ambiguity as to the meaning of the covenants in a contract or the terms of a grant, they should "receive a reasonable construction, and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the grant was made." *"It is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement."*

*Hindman v. Farren*, 353 Pa. 33, 44 A.2d 241, 242 (1945) (citation omitted) (emphasis added).

Clearly and without dispute, the parties here intended to hold title as JTWROS. Appellants argue that following the execution of Bean's 1979 oil and gas lease, the JTWROS between Bean and Quick was severed, resulting in a tenancy in common. Appellants would have us adopt a rule that a lease executed by fewer than all of the joint tenants, in all instances severs a JTWROS. This we refuse to do. The intentions of the parties executing the leases cannot be ignored, lest we cause unwary titleholders to inadvertently undo that unity of title which they must purposefully create.

Intent is equally as significant when addressing the severance of a JTWROS as it is when considering whether a JTWROS was created. "A joint tenancy is severed when one or more of the four unities is destroyed." *Cleck*, at 556. "[I]t is well settled in this state that a joint tenancy with right of survivorship is severable by the action, voluntary or involuntary, of either of the parties." *Angier v. Worrell*, 346 Pa. 450, 31 A.2d 87, 88 (1943) (citation omitted). An involuntary severance "requires an act which effectively divests the joint tenant's interest, such as an attachment execution on a joint tenancy, or an assignment in trust or by judgment and execution. . . ." *Sheridan v. Lucey*, 395 Pa. 306, 149 A.2d 444, 445–46 (1959) (citation omitted). A voluntary severance, such as is alleged here, occurs when one of the joint tenants takes affirmative steps to create a tenancy in common. For example, "[a] joint tenant may obtain a severance or separation of the property or a decree granting partition and obtain thereby an undivided fee interest in one-half of the property." *In re Estate of Larendon*, 439 Pa. 535, 266 A.2d 763, 766 (1970). "[A]lthough a voluntary act on the part of one of the joint tenants is adequate to work a severance, that act must be of sufficient manifestation that the actor is unable to retreat from his position of creating a severance of the joint tenancy." *Sheridan*, at 446; *see also Clingerman v. Sadowski*, 513 Pa. 179, 519 A.2d 378, 383 (1986) ("[A] joint tenancy can be

severed by a unilateral act of one of the parties, so long as the act clearly and unequivocally signifies an intent to sever.").

Therefore, to determine whether the 1979 oil and gas leases severed the JTWROS, we must consider the parties' intentions in executing them. As the trial court observed, the record is devoid of any action by either Bean or Quick which would signify the intent to destroy the joint tenancy. Trial Court Opinion, 11/9/01, at 22. The separate dates on which the leases were signed is not determinative, for the parties may very well have intended to execute the leases contemporaneously. The same corporation was seeking the gas and oil rights, and obviously knew the permission of both tenants was needed before drilling could begin. Both leases were executed in favor of the same party, and neither was recorded until the other was signed—both were recorded on the same day. Both were simultaneously assigned to the same third party. The difference of execution dates of the oil and gas leases by the geographically distant owners does not evince an intent to sever the JTWROS. This is not a situation where each tenant changed the use of the property without the other's agreement. The difference in dates of the leases is simply not the definitive factor it might be in other scenarios.

The leases indicate Bean lived in Kissimmee, Florida, and Quick lived on Long Island, New York. Bean Lease at Original Record, Exhibit E to Item 29 (Petition for Declaratory Judgment), at 1; Quick Lease at Original Record, Exhibit F to Item 29 (Petition for Declaratory Judgment), at 1. Fax machines had not attained ubiquity in 1979, and overnight mail delivery was not then a routine means of sending business documents. Teleconferencing and the like, a staple today, was not the norm 27 years ago. Simultaneous signings by parties 1500 miles apart could not be expected, and more importantly, it was not legally significant, as nothing happened until both leases were executed. Taken in the context of technology and business practices in 1979, the time separating the execution of the leases is not indicative of differing visions of the owners, much less a desire to fundamentally alter the way the two held title.

The two leases themselves were virtually identical by their terms. *See* Trial Court Opinion, 11/9/01, at 22; *In re Estate of Quick*, No. 2122 WDA 2001, unpublished memorandum at 5 (Pa.Super. filed Sept. 17, 2002). The only difference in the two leases—an additional single type-written clause in the Bean lease—is hardly determinative of an intention to sever the JTWROS. The clause states the lessor agreed to take "full responsibility" for questions of ownership and "disbursements"—what "responsibility for questions" means is anyone's guess, but there is no reason to guess that it had anything to do with the way Bean wanted to hold title. The extra clause is so vague and ambiguous as to be meaningless, and is no basis for finding the leases are really different at all; these leases are essentially two copies of the same lease.

The subject matter of the leases also sheds light on the parties' intentions. While this Court has stated that, as between oil and gas leases and other leases, "there is no difference [between them] as respects the interest or estate conveyed . . . ," *Hamilton v. Foster*, 272 Pa. 95, 116 A. 50, 52 (1922), we recognized that

> [i]t is, of course, true that there is a distinction, upon questions of interpretation, between an oil and gas lease and [other types of lease[s]] . . . the reason being that leases, like all other instruments relating to a particular business, must always be construed with due regard to the known characteristics of the business . . . .

*Id.* (citations omitted). Thus, while an oil and gas lease may not be legally dissimilar to other leases, such a lease is clearly contextually different. Here, the oil and gas leases to Gerrie were assigned to Largent Investments at the same time, and then were simultaneously assigned to Loyalhanna Drilling. Moreover, drilling on the property did not commence until after both leases were executed and recorded. Although the leases were executed at different times, in a business context, they were treated functionally as the attainment of but one lease.

The intention of the parties is the ultimate guide when there is doubt or ambiguity regarding a covenant in a

contract or a term in a grant. *See Hindman,* at 242. Their intention is determinative when considering whether a JTWROS was created. *Thompson,* at 771. The intention of the parties must also be considered when determining the severance of that tenancy. There is *no evidence the parties* here intended the 1979 oil and gas leases to sever their JTWROS; their JTWROS remained intact and, by operation of law, Bean became the sole owner of the property upon Quick's death. Accordingly, we affirm the decision of the Superior Court.

Chief Justice CAPPY and Justice CASTILLE join this opinion.

Justice SAYLOR joins this opinion and files a concurring opinion.

Justice NEWMAN files a dissenting opinion.

Former Justices NIGRO and LAMB did not participate in the decision of this case.

Justice SAYLOR, concurring.

I join the majority opinion. The tension between the formalism involved in strictly applying the four unities and the salutary aim of effectuating the wishes of joint tenants has been extensively discussed in the literature. *See, e.g.,* R.H. Helmholz, *Realism and Formalism in the Severance of Joint Tenancies,* 77 NEB. L.REV. 1, 2–3 (1998) (summarizing a segment of the decisions and commentary). I support the decision to favor the latter in the oil-and-gas-lease context, as reflected in the opinions of the orphan's court (per the Honorable Alfred B. Bell), the Superior Court (which adopted Judge Bell's rationale), and the present majority. *Accord* KUNTZ ON THE LAW OF OIL AND GAS § 5.9 (1989).

Justice NEWMAN, dissenting.

Pennsylvania law does not favor joint tenancies, and I dissent from the determination of the Majority that the execution of an oil and gas lease did not sever a joint tenancy with

right of survivorship (JTWROS). In arriving at its position, the Majority has overlooked the four unities that are required to create a joint tenancy and has reached a decision that is inconsistent with our case and statutory law.

"As a first principle, we must recognize that joint tenancies are not favored by the law and that a statute of the Commonwealth eliminates the survivorship feature from joint tenancies unless it is created by express words or by necessary implication." *Pennsylvania Bank and Trust Co. v. Thompson*, 432 Pa. 262, 247 A.2d 771, 771 (1968); *see also* 68 P.S. § 110;[1] *In re Estate of Michael*, 421 Pa. 207, 218 A.2d 338, 342 (1966) (observing that "[b]oth the [statute] and our case law clearly indicate that joint tenancies with the incident right of survivorship are not deemed favorites of the law").

Thus, in Pennsylvania, the vitality of the joint tenancy rests on the existence of the four unities of interest, title, time, and possession. In addition, there must be a specific intent to create the right of survivorship; otherwise the interest created is presumed to be a mere tenancy in common. *See Sheridan v. Lucey*, 395 Pa. 306, 149 A.2d 444, 445 (1959) ("[i]t is basic to the relationship of a joint tenancy that the four unities of time, title, interest and possession co-exist with the right of survivorship [and that this right is] clearly manifested by the conveyance"); *see also Estate of Kotz*, 486 Pa. 444, 406 A.2d 524, 532 (1979) ("joint tenants have one and the same interest, accruing by one and the same conveyance, commencing at one and the same time, and held by one and the same possession"); *In re Parkhurst*, 402 Pa. 527, 167 A.2d 476, 478 (1961) ("[t]he essence of title as joint tenants with the right of

1. In relevant part, this statute provides as follows:

> If partition be not made between joint tenants, whether they be such as might have been compelled to make partition or not, or of whatever kind the estates or thing holden or possessed be, the parts of those who die first shall not accrue to the survivors, but shall descend or pass by devise, and shall be subject to debts, charges, curtesy or dower, or transmissible to executors or administrators, and be considered to every other intent and purpose in the same manner as if such deceased joint tenants had been tenants in common....
>
> 68 P.S. § 110.

survivorship and not as tenants in common is to vest in two or more persons joint ownerships during lifetime, with sole ownership and control passing to the survivor at the death of the other joint tenant"); *In re Cochrane's Estate*, 342 Pa. 108, 20 A.2d 305, 307 (1941) (explaining that "[t]he interests of the joint tenants are equal. They own the half or part and the whole, *per my et per tout.* There is a unity of interest, title, time and possession").

A joint tenancy is severed whenever one or more of the four unities are destroyed. *Kotz*, 406 A.2d at 531–32; *Gen. Credit Co. v. Cleck*, 415 Pa.Super. 338, 609 A.2d 553, 556 (1992), *appeal discontinued*, 531 Pa. 655, 613 A.2d 560 (1992); *Riccelli v. Forcinito*, 407 Pa.Super. 629, 595 A.2d 1322 (1991), *appeal denied*, 529 Pa. 651, 602 A.2d 861 (1992). This may be achieved "by the action, voluntary or involuntary, of either of the parties [resulting in] the parties [becoming] tenants in common." *Stanger v. Epler*, 382 Pa. 411, 115 A.2d 197, 200 (1955); *see also In re Larendon's Estate*, 439 Pa. 535, 266 A.2d 763, 766 (1970). "[A]lthough a voluntary act on the part of one of the joint tenants is adequate to work a severance, that act must be of sufficient manifestation that the actor is unable to retreat from his position of creating a severance of the joint tenancy." *Sheridan*, 149 A.2d at 446.

Prior to the matter *sub judice*, this Court had not addressed whether the execution of a lease by fewer than all of the joint tenants is sufficient to terminate the joint tenancy and to convert the interest into a tenancy in common. Pursuant to the old rule followed in England, when one of the joint tenants with a right of survivorship leased his interest to a stranger, the tenancy was severed. *See* W.W. Allen, "What Acts by One or More of Joint Tenants Will Sever or Terminate the Tenancy," 64 A.L.R.2d 918 § 11 (1959), and cases cited therein. The courts in this country, however, have reached divergent opinions on this issue. The two leading authorities emerged from Maryland and California.

The Maryland courts have followed the traditional English rule. In *Alexander v. Boyer*, 253 Md. 511, 253 A.2d 359 (1969), the Court of Appeals of Maryland held that, where one

joint tenant leased her interest in real property to the husband of another joint tenant, who subsequently sub-leased the property to a third party, the joint tenancy was terminated. The court reasoned that by executing a lease for a certain term, the joint tenant conveyed her rights in the land to the lessee, "thereby changing the nature of her 'interest' in the land from a **present** interest to a **reversionary** interest." *Id.* at 365 (emphasis in original). Noting that the property was sub-leased after the initial transaction, the court also found that the joint tenant "had parted with all of her possessory rights for the term of the lease." *Id.* In accordance with this analysis, the *Alexander* court determined that the transaction destroyed the unities of interest and possession in the joint tenancy. *Id.*

The state of California, however, reaches a different result. As the late Justice Stanley Mosk articulated, in writing for the Supreme Court of California in *Tenhet v. Boswell,* 18 Cal.3d 150, 133 Cal.Rptr. 10, 554 P.2d 330 (1976), when a joint tenant leases his interest to a third person for a term of years, and dies during that term, the lease does not sever the joint tenancy, but expires upon the death of the lessor.

The *Tenhet* court recognized the view expressed in *Alexander. Tenhet,* 133 Cal.Rptr. 10, 554 P.2d at 334 (acknowledging that "[i]t could be argued that a lease destroys the unities of interest and possession because the leasing joint tenant transfers to the lessee his present possessory interest and retains a mere reversion"). The California Supreme Court also acknowledged that it is difficult to reconcile the absolute right of survivorship—the essential element of joint tenancy—with "the possibility that the term of the lease may continue beyond the lifetime of the lessor." *Id.* Conversely, Mr. Justice Mosk noted that "if the lease entered into ... by [the joint tenant] and [the lessee] is valid only during [the joint tenant's] life, then the conveyance is more a variety of life estate *pur autre vie* than a term of years [which is] inconsistent with [the joint tenant's] freedom to alienate his interest during his lifetime." *Id.*

It appears that the disfavored treatment of joint tenancy, embodied in the statutory language of the California Civil Code, which requires express declaration of this interest "in the creating instrument," formed the crux of the legal analysis in *Tenhet*. *Id.* at 335. The opinion reasoned that:

Inasmuch as the estate arises only upon express intent, and in many cases such intent will be the intent of the joint tenants themselves, we decline to find a severance in circumstances which do not clearly and unambiguously establish that either of the joint tenants desired to terminate the estate.

*Id.* at 335–36. This, in turn, led the *Tenhet* court to conclude that "[b]ecause a joint tenancy may be created only by express intent, and because there are alternative and unambiguous means in altering the nature of that estate, we hold that the lease here in issue did not operate to sever the joint tenancy." *Id.* at 336.

In this case, the Majority labels the leases "identical, except the Bean lease contains a type-written addition that states: 'Should any question of property ownership or royalty dispursements [sic] arise, the Lessor has agreed to accept full responsibility.'" Majority Opinion at 489, 905 A.2d at 479. I believe that the term "identical except" is an oxymoron, serving as a red flag to warn that what is purported to be "identical" is actually different. The situation before us is a good example.

In finding the lease identical, the Majority was constrained to overlook, or rationalize away, the reality that **the leases are not the same.** The Majority acknowledges that unlike the document executed by Robert Quick, the agreement signed by Robert Bean contained a typewritten addition encumbering him with full liability for any dispute relating to property ownership or royalty payments. Further, the leases were not signed on the same day; instead, they were signed **three months apart.** This leads me to conclude that the leases were separate from each other and, as a result, failed to meet the essence of a JTWROS, which is four unities: interest, title, time, and possession. *Gen. Credit Co. v. Cleck,* 415 Pa.Super. 338, 609 A.2d 553, 556 (1992).

The Majority is dismissive of these differences, to the detriment of the required unities of interest and possession. Although it recognizes that the Bean lease contained an additional clause not found in the Quick lease, the Majority concludes that what that clause means "is anyone's guess, but there is no reason to guess that it had anything to do with the way Bean wanted to hold title. The extra clause is so vague and ambiguous as to be meaningless, and is no basis for finding the leases are **really different** at all. . . ." Majority Opinion at 494, 905 A.2d at 476 (emphasis added). I find the reasoning of the Majority to be internally inconsistent and curious, at best. First, the Majority states that it is impossible to discern what the clause means; nevertheless, despite this impossibility of interpretation, the Majority concludes that the clause cannot have "anything to do with the way Bean wanted to hold title." *Id.* Next, the Majority finds that the additional clause, which could mean anything or nothing, is "so vague and ambiguous as to be meaningless." Finally, the Majority posits that the impossibility of interpreting the clause means that the two leases are not "really different."

In my opinion, the clause imposes a substantive obligation on Bean that is neither meaningless nor vague. Although the language could have been crafted more artfully, the fact is that the Bean lease includes a substantive obligation that the Quick lease does not. The lease **is** different because of the additional clause, and the Majority merely speculates that it is "meaningless" in order to reach its preordained conclusion that the difference is of no import. The terms of the obligation contained in the clause encumbered Bean with full liability for any dispute relating to property ownership or royalty payments. This disparity, rather than being meaningless, plainly involves important legal obligations.

Likewise, I can not reconcile the fact that the leases were signed **three months apart** with the Majority's view that the separate signings were "not legally significant." Majority Opinion at 493, 905 A.2d at 476. Again, the Majority seeks to minimize this difference by surveying the changes in technology that have occurred since 1979, when fax machines, over-

night mail delivery, and teleconferencing were not used as they are today. While I recognize that it may have been more difficult to effectuate simultaneous signings by parties in the 1970s, it was not impossible. The fact is that the leases were signed on different dates, violating the unity in time requirement for a JTWROS.

The Majority correctly notes that "[i]ntent is equally as significant when addressing a severance of a JTWROS as it is when considering whether a JTWROS was created." Majority Opinion at 492, 905 A.2d at 475. It further acknowledges that "[a] joint tenancy is severed when one of more of the four unities is destroyed." *Id.* (citation omitted). The Majority then proceeds to analyze the intent of the parties in executing the leases and notes that the record does not contain evidence demonstrating that the parties intended to destroy the joint tenancy. While the record was silent with respect to evidence indicating the parties' intent to sever the tenancy, the Majority fills in the gap by surmising that "the parties may very well have intended to execute the leases contemporaneously." *Id.* at 6, 609 A.2d 553.

I find this reasoning flawed, given that the Majority has merely speculated that the parties did not intend to sever the JTWROS, a supposition that is contradicted by fact that the leases were not executed contemporaneously and that one lease contained a substantive term encompassing an obligation that the other one did not. Conjecture by the Majority that the parties did not intend to sever the tenancy does not trump the fact that the parties signed leases that were not identical three months apart.

Essentially, I find that it is necessary to make the same determination as the *Tenhet* court—both solutions to the question that we are facing are reasonable. Although the obvious flexibility of the *Tenhet* approach is appealing, this area of the law, with its multiple nuances and factual scenarios, as vividly demonstrated by this case, requires a plain directive and guidance understandable by all citizens of this Commonwealth, who will be affected by our decision, and by our courts that will ultimately be tasked with applying it.

Therefore, in my opinion, the bright-line rule espoused by *Alexander* that the signing of a lease for a number of years by one of the joint tenants to a third party severs the joint tenancy is the better option.[2]

The rule that I would adopt today is consistent with the way this Court has previously addressed execution of mortgages by joint tenants with right of survivorship. In *Kotz, supra,* we determined that, where **all joint tenants** execute a mortgage for the purchase price of the jointly held property, the unities have not been disturbed and, accordingly, the possessory interest of the joint tenants remains intact. *Kotz,* 406 A.2d at 531–32. On the other hand, this Court has also found that the execution of a mortgage on the joint tenancy property by **fewer than all of the joint tenants** severs the joint tenancy. *Simpson v. Ammons,* 1 Binn. 175 (Pa.1806). Just as with the mortgage in *Simpson,* in our case, the lease was executed by fewer than all of the joint tenants who held the property. Therefore, finding that such a transaction severs joint tenancy promotes harmony with our earlier pronouncement in *Simpson.*

Having concluded that a lease executed by fewer than all of the joint tenants in fact severs a joint tenancy with right of survivorship, it is necessary to consider whether the same rule would apply to the execution of an "oil and gas" lease. In other words, is there something so atypical about an "oil and gas" lease that would require a different result given the present circumstances? I conclude that there is no material difference in this respect.

Admittedly, this Court has recognized the peculiar nature of the "oil and gas" leaseholds. "Owing to the marked differences in the nature of oil and gas and solid minerals such as coal, the rights of lessees in the respective minerals are not the same. . . . They bear scarcely any resemblance to a house

2. We recognize that this rule may prevent the fairest results in specific cases. However, it will also provide the needed predictability in the way future disputes would be resolved, which will ultimately serve to ensure justice by forestalling the contextual, intent-oriented decision-making that the analysis of this issue could become should we adopt the other approach.

or farm lease and they resemble only in part leases for solid minerals such as coal." *Appeal of Baird,* 334 Pa. 410, 6 A.2d 306, 311 (1939) (*per curiam*); *see also Kleppner v. Lemon,* 176 Pa. 502, 35 A. 109, 109 (1896) ("[t]he nature of oil and gas, the pressure of the superincumbent rocks, and the vagrant habit of both fluids under the influence of this pressure, enter into the contemplation of both parties to such an agreement").

Gas, it is true, is a mineral; but it is a mineral with peculiar attributes, which require the application of precedents arising out of ordinary mineral rights, with much more careful consideration of the principles involved than of the mere decisions.... Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals *feroe natura.* In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner.... They belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control; but when then escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas. If an adjoining, or even a distant, owner, drills his own land, and taps your gas, so that it comes into his well and under his control, it is no longer yours, but his.

*Westmoreland & Cambria Nat. Gas Co. v. DeWitt,* 130 Pa. 235, 18 A. 724, 725 (1889); *see also Hague v. Wheeler,* 157 Pa. 324, 27 A. 714, 719 (1893) ("it is said that the oil and gas are unlike the solid minerals, since they may move through the interstitial spaces or crevices in the sand rocks in search of an opening through which they may escape from the pressure to which they are subject").

Nonetheless, despite the unique, fugacious nature of oil and gas, "oil and gas" leases are treated in the same manner as other documents purporting to convey property interests:

It is, of course, true that there is a distinction, upon questions of interpretation, between an oil and gas lease and an agricultural and even a coal lease ... the reason being

that leases, like all other instruments relating to a particular business, must always be construed with due regard to the known characteristics of the business ... but there is no difference between them as respects the interest or estate conveyed ... and ... as to the owner in fee and his grantees, their dominion is, upon general principles, as absolute over the fluid as over the solid minerals. It is exercised in the same manner and with the same results.

*Hamilton et al. v. Foster*, 272 Pa. 95, 116 A. 50, 52 (1922) (internal citations and quotations omitted); *see also Prager's Estate*, 74 Pa.Super. 592, 595 (1920) ("[w]hile owing to the migratory or fugacious character of oil and gas there are certain distinctions existing between them and fixed minerals, there is no difference as respects the interest or estate conveyed by [a will]").

In the case before us, I see no difference between an "oil and gas" lease and a "run-of-the-mill" leasehold. In both instances, the lessee obtains the right to present enjoyment and utilization of the property for a predetermined period of time. Ultimately, applying the rule I propose today to the facts of this case, I find that by executing a lease in favor of Gerrie, Robert Bean irrevocably altered the nature of his interest in the land, changing from a present interest to a reversionary interest, thus destroying the unities of interest and possession and terminating the joint tenancy. The unity of time was destroyed by the three-month gap between the parties' signing of the leases. Thus, after Robert Bean leased his interest to Gerrie, both Robert Bean and Robert Quick owned undivided one-half interests in the property as tenants in common. Following his death in 1981, the interest of Robert Quick did not revert to Robert Bean, but remained an asset in his estate.

### Conclusion

Accordingly, for all of the above reasons, I would reverse the Opinion and Order of the Superior Court.