IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| RUTH ANN GRANT, AS EXECUTRIX OF THE ESTATE OF RUTH M. GRANT, SUCCESSOR IN THE INTEREST TO RUTH M. GRANT, | : | No. 18 WAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered December |
| | : | 13, 2023, at No. 380 WDA 2023, |
| Appellant | : | Affirming the Order of the Court of |
| | : | Common Pleas of Westmoreland |
| | : | County entered March 20, 2023, at |
| v. | : | No. 1172 of 2020. |
| | : | |
| | : | ARGUED:  April 9, 2025 |
| LOUIS A. GRANT, JR., | : | |
| | : | |
| Appellee | : | |

## OPINION

JUSTICE McCAFFERY                                   DECIDED:  AUGUST 19, 2025

This appropriately titled case deals with the effect of a self-conveyance of real property.  Ruth M. Grant (Mother) and her son, Louis A. Grant, Jr. (Son), originally owned property together as joint tenants with the right of survivorship.  Mother subsequently conveyed the property from herself (as grantor) back to herself (as grantee), with the intention of severing their joint tenancy.  Severing the joint tenancy would transform it into a tenancy in common, meaning Son would not automatically acquire Mother's interest in the property upon her death.  We must decide whether Mother's chosen method of conveyance — a quitclaim deed transferring her own interest to herself — successfully severed the joint tenancy.  For the reasons that follow, it did not.

We hold that a quitclaim deed self-conveying a joint tenant's interest in property directly back to herself is insufficient to sever a joint tenancy. As we explain, Mother's action did not destroy any of the four unities of title, time, interest, or possession that characterize a joint tenancy. Because she did not destroy any of the unities, she was able to retreat from her position. Therefore, she did not manifest sufficient intent to sever the joint tenancy. When a joint tenant manifests an intent to sever a joint tenancy, but does not destroy any of the four unities, the joint tenancy remains intact.

## I. LEGAL BACKGROUND

There are three property law concepts that are essential to understanding this case: joint tenancies, tenancies in common, and quitclaim deeds. Joint tenancies and tenancies in common are two ways for multiple people to own property together in Pennsylvania. These legal structures, which are forms of "concurrent ownership," trace their origins to the English common law. *See United States v. Craft*, 535 U.S. 274, 279 (2002) (citation omitted).

"Joint tenancies were the predominant form of concurrent ownership at common law[.]" *Craft*, 535 U.S. at 280 (citation omitted). Each joint tenant possesses "the entire estate, rather than a fractional share[.]" *Id.* (citation omitted). The "essence" of a joint tenancy is the four unities of interest, title, time, and possession. *In re Est. of Quick*, 905 A.2d 471, 474 (Pa. 2006) (citation omitted). This means joint tenants must (1) acquire interests "in the property of the same type, duration and amount[,]" (2) acquire their title "by the same instrument[,]" (3) acquire interests that "vest at the same time[,]" and (4) possess an "undivided interest in the whole estate." *Fenderson v. Fenderson*, 685 A.2d 600, 607 (Pa. Super. 1996). "[I]n other words, joint-tenants have one and the same interest, accruing by one and the same conveyance, commencing at one and the same

time, and held by one and the same undivided possession." William Blackstone, 2 *Commentaries on the Law of England* \*180 (1766) (Blackstone).

Yet the "hallmark distinguishing the joint tenancy from the tenancy in common is the right of survivorship[.]" *Edel v. Edel*, 424 A.2d 946, 947 (Pa. Super. 1981). The right of survivorship is a right to "automatic inheritance[,]" meaning that when one joint tenant dies, "that tenant's share in the property does not pass through will or the rules of intestate succession; rather, the remaining tenant or tenants automatically inherit it." *Craft*, 535 U.S. at 280 (citations omitted).[1]

The second concept crucial to understanding this appeal is the tenancy in common. Tenancies in common are "now the most common form of concurrent ownership." *Craft*, 535 U.S. at 279 (citation omitted). In Pennsylvania, prior to 1812, a "conveyance or devise to two or more persons … was presumed to create a joint tenancy with the right of survivorship unless otherwise clearly stated[.]" *Zomisky v. Zamiska*, 296 A.2d 722, 723 (Pa. 1972). In 1812, however, the General Assembly reversed that presumption, such that a conveyance is now presumed to create a tenancy in common. *See id.*; *see also* Act of Mar. 31, 1812, P.L. 259 (68 P.S. § 110).

Tenancies in common differ from joint tenancies in several respects. One difference is that each tenant in common owns "a separate fractional share in undivided property[,]" whereas joint tenants each possess the entire estate. *Craft*, 535 U.S. at 279-280 (citation omitted). Additionally, a tenancy in common is not characterized by the four

---

[1] Although the right of survivorship is occasionally framed as a right of automatic inheritance, this may not be the most theoretically consistent way of thinking about it. Instead, because joint tenants are regarded as a single owner by a common law fiction, each "owns the undivided whole of the property[.]" Jesse Dukeminier, James E. Krier, Gregory S. Alexander, Michael H. Schill & Lior Jacob Strahilevitz, *Property* 388 (9th Ed. 2017) (Dukeminier). Consequently, "when one joint tenant dies **nothing passes** to the surviving joint tenant or tenants. Rather, the estate simply continues in survivors freed from the participation of the decedent, whose interest is extinguished." *Id.* (emphasis in original).

unities described above. Instead, "a tenancy in common need only contain the unity of possession." *Edel*, 424 A.2d at 948 (citations omitted). The most relevant difference here, however, is that tenants in common do not have the right of survivorship. *See id.* at 947. Therefore, when a tenant in common dies, "his interest descends or passes by will to his heirs or devisees; the remaining co-tenants acquire no additional interest in such an estate." *Id.* at 948 (citations omitted).

This brings us to the third legal concept central to this appeal: the quitclaim deed. A quitclaim deed is used "when a party wishes to sell or otherwise convey an interest he may think he has in land but does not wish to warrant his title. It does not purport to convey anything more than the interest of the grantor at the time of its execution." *Greek Cath. Congregation of Borough of Olyphant v. Plummer*, 12 A.2d 435, 437 (Pa. 1940) (citation omitted). It conveys the grantor's interest or title in the property — whatever that interest or title may be — rather than the property itself. *See id.* (citation omitted). A quitclaim deed does not warrant or profess that the grantor's title is valid. *See* Black's Law Dictionary (12th Ed. 2024) ("DEED"). Therefore, if there is any doubt as to the validity of the grantor's ownership, the grantee bears the risk. In sum, a quitclaim deed "excludes any implication that [the grantor] has good title, or any title at all. Such a deed in no way obligates the grantor. If he has no interest, none will be conveyed." *Id.* (citation omitted). It is as though the grantor "quits" making any "claim" to the property, and gives the grantee the right to assert that claim.

With this legal background in place, we turn to the facts before us.

## II. FACTS AND PROCEDURAL HISTORY

In 1996, Mother acquired real property in Murrysville, Pennsylvania (the property). She conveyed the property to herself and to Son, as joint tenants with the right of survivorship. Son's residence was located on the property. The relationship between

Mother and Son deteriorated, and in 2020, Mother sued to force a partition, or division, of the property into individually owned interests.[2]

While the partition action was still pending, Mother executed a quitclaim deed transferring whatever interest she had in the property back to herself. In other words, she transferred her interest from herself (as grantor) to herself (as grantee). The quitclaim deed explicitly stated its purpose was to sever the joint tenancy and create a tenancy in common. *See* Quitclaim Deed, 11/1/2021, at 2 ("The purpose of this deed is to sever the joint tenancy of [Mother] and [Son] and to create a tenancy in common between [Son] and the Grantee.").

In May 2022, Mother died, leaving her entire estate to her daughters by will, while the partition litigation over the property was still pending. Ruth A. Grant (Executrix), as executrix of her estate, was substituted as a party on behalf of Mother. Son raised the defense of abatement,[3] claiming Mother's death prior to the entry of judgment in the partition action barred relief on her claims. He further argued the quitclaim deed did not

---

[2] There were numerous filings in the partition action: Son filed an answer with new matter and counterclaims, alleging Mother acquired her interest through fraud, accident, or mistake, and therefore lacked valid title to the property. He also presented counterclaims of constructive trust and unjust enrichment, and sought declaratory judgment for adverse possession. Mother filed an answer with new matter and preliminary objections.

Son responded with an amended counterclaim, in which he explained he "had previously been involved in a divorce proceeding" before acquiring the property at issue here. First Amended Counterclaim, 8/21/2020, at ¶ 51. Son alleged Mother, "using her motherly powers of persuasion and taking advantage of [Son's] trust[,] … fraudulently or accidentally or mistakenly convinced [Son] that it would be best for [Son] and [Mother] to own the [p]roperty together to avoid any problems with future girlfriends or spouses of [Son]." *Id.* at ¶ 52. Son averred Mother never stayed overnight at the property, and never paid for any mortgages, taxes, bills, or improvements related to the property. Mother filed preliminary objections to Son's amended counterclaims, which the trial court overruled. The intricacies of the partition action, however, are not germane to this appeal.

[3] Abatement is the "suspension or defeat of a pending action for a reason unrelated to the merits of the claim[.]" Black's Law Dictionary (12th Ed. 2024) ("ABATEMENT").

sever the joint tenancy. In essence, Son reasoned Executrix did not have standing in the partition action because — by virtue of his status as a joint tenant with the right of survivorship — the property automatically became his alone when Mother died.

Although Son maintained the quitclaim deed did not successfully sever the joint tenancy, he nevertheless described it as a "cloud on the title" and sought a declaratory judgment to quiet title.[4] First Amended New Matter and Second Amended Counterclaim, 7/21/2022, at ¶ 101. Executrix filed an answer and preliminary objections, asserting Son failed to join the estate as an indispensable party.

The trial court overruled Executrix's preliminary objections, explaining that "the mere pendency of an action in partition, without more, is insufficient to work a severance of the joint tenancy, whereupon an abatement occurs upon the death of the joint tenants." Trial Court Order, 10/14/2022, at ¶ 1 (*citing Sheridan v. Lucey*, 149 A.2d 444, 446 (Pa. 1959)). In other words, the trial court held Mother's initiation of a partition action did not sever the joint tenancy, and the partition action abated upon Mother's death. The court also stated that the abatement of the partition action did "not prevent either party from obtaining relief regarding the property at issue, as other civil actions may be brought by or against the estate that would more appropriately address the issue." *Id.* at ¶ 2.

Executrix and Son both filed motions for clarification of the trial court's order. During a subsequently scheduled phone conference, the parties agreed the partition action was abated and Son's counterclaim to quiet title would continue. *See* Trial Court Opinion, 5/17/2023, at 3. Executrix maintained the quitclaim deed successfully severed the joint tenancy. Son, on the other hand, argued the quitclaim deed was insufficient to

---

[4] "An action to quiet title is designed to resolve a dispute over the title to real estate of which the plaintiff is in possession. The plaintiff bringing a quiet title action has the burden of proof and must recover on the strength of its own title." *Landis v. Wilt*, 222 A.3d 28, 34 (Pa. Super. 2019) (citation omitted).

sever the joint tenancy "because it merely deeded the property back to [Mother], not to a third party." *Id.* Thus, Son insisted the quitclaim deed "did not break the unity of title, and [Mother] could retreat from the action" at any time. *Id.*

In response to a motion from Son, the trial court issued a judgment on the pleadings. The court observed that all parties agreed (1) Mother and Son previously owned the property as joint tenants with a right of survivorship, and (2) Mother executed a quitclaim deed to convey her interest in the property from herself to herself with the intention of severing the joint tenancy. *See* Trial Court Order, 3/6/2023, at 1. With no remaining dispute of material fact, the trial court addressed the legal question: whether the quitclaim deed was sufficient to sever the joint tenancy. The court determined Mother's quitclaim deed conveying her interest to herself "did not destroy the four unities, as she retained her interest in the property, and retreat from said action was possible." *Id.* at 2. Because the quitclaim deed was insufficient to sever the joint tenancy with right of survivorship, the trial court concluded title passed fully to Son upon Mother's death. *See* Trial Court Opinion, 5/17/2023, at 5-6. Consequently, the court quieted title in favor of Son.

Executrix appealed to the Superior Court, claiming the trial court erred in holding the quitclaim deed failed to sever the joint tenancy. Executrix also alleged the trial court violated the presumption against joint tenancies and should have concluded Mother and Son were tenants in common such that a one-half interest in the property was held by Mother's estate.

The Superior Court affirmed the trial court's judgment in favor of Son. *See Grant v. Grant*, 311 A.3d 581 (Pa. Super. 2023) (unpub. memo.). The Court explained that a joint tenant may sever a joint tenancy with an act that destroys one of the four unities, but the act "must be of sufficient manifestation that the actor is unable to retreat from the

position of creating a severance of the joint tenancy." *Id.* at *7 (*citing Allison v. Powell*, 481 A.2d 1215, 1217 (Pa. Super. 1984)). Echoing the trial court's reasoning, the Superior Court found its previous decision in *Wolf v. Nearing*, 272 A.3d 493 (Pa. Super. 2022) (unpub. memo.), to be persuasive.

As recounted by the panel below, in *Wolf*, a mother and father conveyed property to their two daughters as joint tenants with the right of survivorship. One of the daughters, Wolf, executed a deed conveying her one-half interest to herself and her husband as tenants in common. Wolf argued this conveyance severed the joint tenancy between the two sisters. The *Wolf C*ourt disagreed, opining that Wolf's conveyance was not "of sufficient manifestation that [she was] unable to retreat" from her position because she "retained her undivided one-half interest in the [ ] property, although purportedly as a tenant in common with" her husband. *Wolf*, 272 A.3d at *3 (citation omitted). In other words, the Superior Court reasoned Wolf's deed conveying her interest to herself and her husband was insufficient to sever the joint tenancy because the deed "resulted in no divestiture of Wolf's interest" in the property. *Id.*

The Superior Court stressed the similarity between *Wolf* and this appeal. In both instances, the Court explained, the party seeking to sever the joint tenancy "did not convey her interest to a third party." *Grant*, 311 A.3d at *9 (citation omitted). Consequently, the Superior Court concluded Mother's "[q]uitclaim [d]eed of self-conveyance, from herself to herself, [was] not sufficient to sever the four unities of joint tenancy" because "the act was not of sufficient manifestation that the actor was unable to retreat from the position of creating a severance of the joint tenancy." *Id.*

## III.  ISSUES

Executrix sought review in this Court, and we granted allocatur to consider the following questions:

a. Did the Superior Court err in holding that the quitclaim deed that is the subject of the instant action was insufficient manifestation of [Mother's] intent to sever the joint tenancy with [Son] from which she could not retreat because that finding conflicts with other intermediate appellate court opinions and determinations of this Court?

b. Did the Superior Court err in concluding that there was no severance of the joint tenancy because [Mother] did not convey the [property] to a third party because that holding conflicts with prior determinations of this Court?

*Grant v. Grant*, 322 A.3d 153 (Pa. 2024).

## IV. ANALYSIS

Two facts, which are not in dispute, set the stage for the legal question in this case. First, Mother and Son owned the property together as joint tenants with the right of survivorship. Second, Mother executed a quitclaim deed transferring her interest from herself as grantor to herself as grantee, with the explicit intention of severing the joint tenancy and creating a tenancy in common. We address the two issues before us together, as they both present a single legal question: Whether Mother succeeded in severing the joint tenancy *via* the quitclaim deed. For the following reasons, we conclude she did not.

### A. Severance of the Joint Tenancy

We begin with the standard for severing a joint tenancy. Under Pennsylvania law, "although a voluntary act on the part of one of the joint tenants is adequate to work a severance, that act must be of sufficient manifestation that the actor is unable to retreat from his position of creating a severance of the joint tenancy." *Sheridan*, 149 A.2d at 446. Severance can result from "a unilateral act of one of the parties, so long as the act clearly and unequivocally signifies an intent to sever." *Clingerman v. Sadowski*, 519 A.2d 378, 383 (Pa. 1986) (citations omitted). When a joint tenancy is destroyed, it becomes a tenancy in common. *See Yannopoulos v. Sophos*, 365 A.2d 1312, 1314 (Pa. Super. 1976) (*citing* Blackstone at *185).

Our courts have identified certain acts that manifest sufficient intent such that the actor is unable to retreat, thereby severing the joint tenancy. For example, the Superior Court has held that executing a sales agreement to a third party severed a joint tenancy. *See Yannopoulos*, 365 A.2d at 1314-1315. Similarly, the Superior Court has concluded the execution of a mortgage by one of two tenants severed a joint tenancy. *See Gen. Credit Co. v. Cleck*, 609 A.2d 553, 557 (Pa. Super. 1992); *see also Simpson's Lessee v. Ammons*, 1 Binn. 175, 177 (Pa. 1806) (holding the execution of a mortgage by fewer than all the tenants severed a joint tenancy).

Conversely, perhaps the most obvious example of a manifestation of intent from which retreat is still possible is the mere initiation of a partition action. Certainly, seeking a court-ordered partition of the estate manifests an intention to sever a joint tenancy. *See* John V. Orth, *The Perils of Joint Tenancies*, 44 REAL PROP. TR. & EST. L.J. 427, 439 (2009) (Orth) ("Nothing can more objectively express the intention to sever a joint tenancy and eliminate the right of survivorship than the filing of a partition action."). However, the party seeking partition is free to discontinue their action at any time. In other words, they are free to retreat from their position. That is why this Court has held that "the mere pendency of an action in partition, without more, is insufficient to work a severance of the joint tenancy, whereupon an abatement occurs upon the death of one of the joint tenants." *Sheridan*, 149 A.2d at 446. In contrast, once a court has issued a judgment partitioning the joint tenancy, the severance has been accomplished and the party can no longer retreat. *See id.*[5]

---

[5] Presently, the parties agree the partition action has abated and did not sever the joint tenancy. *See Grant*, 311 A.3d at *3 (*citing* Trial Court Opinion at 3); *see also id.* at *7 n.7 (Executrix does not "claim [Mother's] commencement of the partition action severed the joint tenancy.").

Despite this focus on intent, our cases continue to recognize the relevance of the four unities to the severance of joint tenancies. *See Quick*, 905 A.2d at 475 ("A joint tenancy is severed when one or more of the four unities is destroyed.") (citation omitted). This highlights the tension between two different approaches to this area of the law. On the one hand, there is the "formalism involved in strictly applying the four unities[.]" *Id.* at 477 (Saylor, J., concurring). On the other hand, there is the intent-based approach that seeks to "effectuat[e] the wishes of joint tenants[.]" *Id.*

1. The formalist approach to severance.

The formalist approach is the traditional common law rule. It ties severance of a joint tenancy to the destruction of any one of the four unities of time, title, interest, or possession. *See* Blackstone at *185 ("We are, lastly, to enquire, how an estate in joint-tenancy may be severed and destroyed. And this may be done by destroying any of [its] constituent unities.") (emphases omitted). Under the formalist, unities-based approach, a self-conveyance does not sever the joint tenancy because it fails to sever any of the four unities. At common law, "severance by self-conveyance, that is, a conveyance from one joint tenant to himself as tenant in common … had null effect[.]" Orth at 431 (citation omitted); *see also* Joseph W. Singer, Bethany R. Berger, Nestor M. Davidson & Eduardo M. Peñalver, *Property Law: Rules, Policies, and Practices* 668 (7th Ed. 2017) (Singer) ("Traditionally, [self-severance] could not be done because it did not break the four unities[.]"); R. H. Helmholz, *Realism and Formalism in the Severance of Joint Tenancies*, 77 NEB. L. REV. 1, 10 (1998) (Helmholz) ("Under traditional law, neither the unilateral self-conveyance nor the formal declaration disturbed the four unities. Both were therefore ineffective in severing the joint tenancy."). The reasoning behind this conclusion was that "the grantor, who was also the grantee, still held one and the same interest, accruing by one and the same conveyance, commencing at one and the same time, and held by one

and the same undivided possession, that is, none of the unities had been destroyed." Orth at 431-432 (citation and quotation marks omitted).

To get around this roadblock to severance, joint tenants seeking severance conveyed their interest to a third party — known as a "straw man"[6] — who then immediately reconveyed the interest back to the original grantor. If a joint tenant wanted to unilaterally sever the joint tenancy and continue as a tenant in common, the law required conveyance to a straw man. *See* Helmholz at 6. Without that third-party conveyance, "the four unities [would] not have been destroyed." *Id.* With the straw man, however, the joint tenancy "may be destroyed, by destroying the unity of title. As if one joint-tenant [alienates] and conveys his estate to a third person: here the joint-tenancy is severed, and turned into tenancy in common[.]" Blackstone at *185 (emphasis omitted).

An understanding of how land transfers operated provides further conceptual support for the necessity of third-party conveyance. "Livery of seisin" was the "ceremony by which a grantor conveyed land to a grantee." Black's Law Dictionary (12th Ed. 2024) ("LIVERY OF SEISIN"). The phrase can be translated as "delivery of possession," with "*livery* (meaning 'delivery,' from the Old French *livrer*) of *seisin* (meaning, roughly, 'possession,' from the Old French *saisir* or *seisir*)." *Id.* (citation omitted). The ceremony often involved "going on the land and having the grantor symbolically deliver possession of the land to the grantee by handing over a twig, a clod of dirt, or a piece of turf[.]" *Id.* While this may seem quaint in a world with a "modern system of land records, it would be desirable that the transfer be effected with sufficient ceremony not only to mark itself indelibly in the memories of the participants, but also to give notice to interested persons[.]" *Id.* (*citing* Thomas F. Bergin & Paul G. Haskell, *Preface to Estates in Land*

---

[6] A straw man is a "third party used in some transactions as a temporary transferee to allow the principal parties to accomplish something that is otherwise impermissible." Black's Law Dictionary (12th Ed. 2024) ("STRAW MAN").

*and Future Interests* 10-11 (2d Ed. 1984)).  Thus, conveyance required some meaningful transfer from one person to another.  Against this backdrop, the inadequacy of self-conveyance to work a change in title becomes more apparent.

    2.  <u>The intent-based approach to severance.</u>

Nevertheless, the traditional formalist approach is not without its critics.  In the 1950s, academic scholarship on the law of severance of joint tenancies became unsympathetic to the formalist approach tied to the four unities.  *See* Helmholz at 1-2.  The "single theme" of the criticism was that the "law of severance was based upon a needless and outmoded formalism" and "had become thoroughly burdened with concepts which might be described as archaic."  *Id.* at 2 (citations and quotation marks omitted).  The critics recommended focusing on the parties' intent.

Courts in several other states have chosen a more heavily intent-based approach.  *See, e.g.*, *Hendrickson v. Minneapolis Fed. Sav. & Loan Ass'n*, 161 N.W.2d 688, 691 (Minn. 1968) (allowing one joint tenant to "terminate the joint tenancy by declaration without being required to go through the ceremony of a conveyance to a strawman and a reconveyance back again"); *Riddle v. Harmon*, 162 Cal. Rptr. 530, 534 (Ct. App. 1980) (discarding the "archaic rule" preventing one joint tenant from severing a joint tenancy "without the use of an intermediate device" because the rule would "defeat the clear intention of the grantor"); *Minonk State Bank v. Grassman*, 432 N.E.2d 386, 390 (Ill. App. Ct. 1982), *aff'd,* 447 N.E.2d 822 (Ill. 1983) (allowing unilateral severance by self-conveyance, noting that "courts have been inclined to allow severance in any variety of ways once the intent to sever has been demonstrated"); *Countrywide Funding Corp. v. Palmer*, 589 So. 2d 994, 996 (Fla. Dist. Ct. App. 1991) (self-conveyance severs a joint tenancy); *In re Est. of Knickerbocker*, 912 P.2d 969, 974-976 (Utah 1996) (allowing severance by self-conveyance and relying on *Minonk State Bank* and *Riddle*); *Taylor v.*

*Canterbury*, 92 P.3d 961, 962 (Colo. 2004) (allowing severance by self-conveyance because "[t]he four unities are no longer the compass; rather, the polestar by which joint tenancies are now measured is the intent of the parties."); *In re Est. of Johnson*, 739 N.W.2d 493, 497 (Iowa 2007) (adopting an "intent-based approach" to determining whether a joint tenancy was severed); *Reicherter v. McCauley*, 283 P.3d 219, 223 (Kan. Ct. App. 2012) (self-conveyance by quitclaim deed severs a joint tenancy "[u]pon effective delivery during the grantor's life").

Executrix echoes many of these criticisms, insisting that requiring third-party conveyance is a "historical anachronism." Appellant's Brief at 19. She cites some of the out-of-state decisions referenced above that allow severance by self-conveyance. *See id.* at 19-20. Nevertheless, we hold today that a joint tenant who manifests an intent to sever a joint tenancy — but does not destroy any of the four unities — fails to sever the joint tenancy. As we now explain, there are compelling reasons for the four unities to remain relevant — alongside intent — to the law governing the severance of joint tenancies, notwithstanding the approach taken by some of our sister states.

3. The benefits of retaining some consideration of the four unities.

Despite the endorsements of the intent-based approach, there are several reasons to maintain some focus on the four unities that characterize the traditional approach. First, it promotes judicial economy and gives litigants reliable guidance. Scholars have recognized that "the substitution of an intent-based approach for the traditional four unities [is] more complicated in application[.]" Orth at 439. Conveyance to a third party helps ensure severance is deliberate. This clear, formal requirement reduces litigation by establishing a bright-line rule. Rather than requiring fact-intensive proceedings wherein courts are forced to divine the intent of a deceased tenant, courts can instead look to objective legal realities.

Moreover, intent can be "very difficult to determine." Helmholz at 19. This is especially true with respect to deceased joint tenants, as "[t]hinking about severance requires thinking about dying. Joint tenants are understandably reluctant to do this, and some cases have had to discover the parties' intent from very slim evidence pointing one way or the other." *Id.* A purely intent-based approach is "an invitation to litigation in a way a mechanical test is not." *Id.* The formal approach, by contrast, "provides direct answers." *Id.* at 25. While the quitclaim deed at issue here made Mother's intent clear, we must provide a rule that is manageable in future cases as well.

In addition to promoting judicial economy, our approach provides reliable guidance to litigants. An objective inquiry into the four unities yields "the relative predictability provided by traditional law" and prevents "a wholesale shift to individualized judicial determinations of intent." Orth at 440 (citation omitted). Allowing unilateral self-severance, on the other hand, means there "is less protection for the other joint tenant than there would be if compliance with the four unities were strictly required." Helmholz at 26. While joint tenants are always at some risk of losing their right to survivorship through severance, they also have some expectations that arise from the estate. Indeed, "the expense and delay incident upon administration of a decedent's estate today has led to a widespread revival of the survivorship tool as [a] means of effecting a simple and economical transfer of property on death." Orth at 431 (citation omitted); *see also Tenhet v. Boswell*, 554 P.2d 330, 335 n.5 (Cal. 1976) (explaining the joint tenancy "remains a popular form of property ownership … on the ground that it avoids the delay and administrative expenses of probate.") (citation omitted).

A second benefit of our holding today is that it reduces — albeit imperfectly — the risk of fraud. Numerous commentators have highlighted the problems associated with secret conveyances. They offer some version of the following hypothetical to illustrate

the problem: A husband and a wife own property together as joint tenants with the right of survivorship. The husband secretly executes a deed severing the joint tenancy. He deposits the deed in his safety deposit box along with his will leaving his share to his daughter. If the husband dies first, the severed deed will be discovered along with the will, and the daughter will inherit the husband's share. If his wife dies first, however, he can keep the deed a secret and take possession of the whole estate through the right of survivorship. *See* Samuel M. Fetters, *An Invitation to Commit Fraud: Secret Destruction of Joint Tenant Survivorship Rights*, 55 FORDHAM L. REV. 173, 175 (1986); *see also* John G. Sprankling, Raymond R. Coletta & Rachael E. Salcido, *Property: A Contemporary Approach* 374 (6th Ed. 2024); Dukeminier at 397; Singer at 668; Orth at 432; Helmholz at 26; *Est. of England*, 284 Cal. Rptr. 361, 363 (Ct. App. 1991). The hypothetical illustrates "what the economists call 'strategic behavior.'" Helmholz at 26.

In contrast to the example recounted above, we acknowledge that Mother's quitclaim deed was recorded. *See* Appellant's Brief at 6. Moreover, requiring conveyance to a third party does not completely eliminate the risk presented by the hypothetical. Nevertheless, it does provide some deterrence, as the straw man would be aware of the secret conveyance. "Although elimination of the four unities does not make this kind of fraudulent severance possible for the first time, there can be little doubt that it does make it easier." Helmholz at 26 (citation omitted).

Some states have sought to reduce the risk of fraudulent secret conveyances by means of legislation "making recording of the severing instrument necessary for its effectiveness." Orth at 432 (*citing* CAL. CIV. CODE § 683.2(c) (West 2007); COLO. REV. STAT. § 38-31-101(5)(a) (2008)). The general rule, however, is that "a conveyance can be effective notwithstanding a failure to record, at least between grantor and grantee." *Id.* at 432 n.26. Pennsylvania follows this general rule: While a deed conveying land that is

not recorded "shall be adjudged fraudulent and void as to any subsequent bona fide purchaser or mortgagee or holder of any judgment," joint tenants enjoy no such protection against secret severance. 21 P.S. § 351; *see also Nguyen v. Delaware Cnty. Tax Claim Bureau*, 244 A.3d 96, 108 (Pa. Cmwlth. 2020) ("Under Pennsylvania law, title to real estate may be passed by execution and delivery of a deed, before or even without recording it.") (citations omitted). Without a statutory requirement that the severing instrument be recorded, third party conveyance provides some modest protection against fraudulent secret severance.

A third reason to avoid completely discarding the formalist approach is that the intent-based approach is not without its theoretical inconsistencies. Consider, for example, the rule that the mere initiation of a partition action is insufficient to sever the joint tenancy. *See Sheridan*, 149 A.2d at 446. The cases are "virtually unanimous" in this result. Helmholz at 30. The rationale given for this outcome is that the parties seeking partition may change their minds before judgment, although that rationale "seems a poor justification [for this outcome] in the face of their clearly expressed intent to sever and the untimely death of one of them." *Id.* Rather, the justification is more formalistic: "Partition cannot be effective before it is obtained. One cannot secure the results of a judicial action simply by asking for it." *Id.* If intent were the only consideration, this reasoning "ring[s] a little hollow." *Id.* at 30-31 (*citing Allison*, 481 A.2d at 1218 (Cavanaugh, J., concurring) ("It is only the event of his death prior to the final decree, and not that the petitioner has changed his mind, that prevents the severance.")).

Finally, we recognize that conveyance to a third party makes use of a legal fiction. However, self-conveyance by quitclaim deed also employs a legal fiction. Abandoning the legal fiction of third-party conveyance, therefore, would not be abandoning legal fictions in this area of law outright. Instead, we would be exchanging a time-tested legal

fiction that provides courts and parties with clear, workable standards for a different legal fiction, namely, unilateral self-conveyance. There is no indication that requiring third-party conveyance has produced an unworkable legal regime. Nor is there any indication that the burden of this additional formality outweighs the beneficial predictability it provides to litigants or the clear guidance it provides to courts.

    4. Executrix's counterarguments.

    Executrix urges us to abandon any attachment to the traditional approach. Though as we now explain, we are unpersuaded by her arguments. Executrix first asserts the quitclaim deed was a sufficient manifestation of Mother's intent to sever the joint tenancy, from which Mother could not retreat. *See* Appellant's Brief at 9. According to Executrix's theory, Mother severed the unities of title and interest when she signed the deed, immediately creating a tenancy in common. *See id.* at 12. Executrix points to two cases to support her position. In *Yannopoulos*, as Executrix observes, the Superior Court held a joint tenant severed a joint tenancy upon executing a sales agreement. *See id.* (*citing Yannopoulos*, 365 A.2d at 1314-1315). The Superior Court explained in *Yannopoulos* that the execution of the sales agreement immediately divested the seller of equitable title, thereby destroying the unity of title and putting the seller in a position from which retreat was impossible. *See Yannopoulos*, 365 A.2d at 1315. The Court concluded, therefore, that the joint tenancy was destroyed. Executrix also relies on *Cleck*, wherein the Superior Court held the execution of a mortgage severed a joint tenancy. *See* Appellant's Brief at 12 (*citing Cleck*, 609 A.2d at 557). As with the sales agreement in *Yannopoulos* and the mortgage in *Cleck*, Executrix alleges the quitclaim deed severed the joint tenancy here the moment Mother executed it.

    There are two problems with Executrix's approach. The first is that both *Yannopoulos* and *Cleck* delt with conveyances to **third** parties. This is precisely the role

the straw man would have played here. The second problem is that Mother's quitclaim deed did not sever the unities of title or interest. She transferred her interest in the joint tenancy directly to herself, meaning neither title nor interest changed. The quitclaim deed was only capable of conveying the interest Mother had in the property, which was an interest as a joint tenant with the right of survivorship. And because Mother held the title before, during, and after the execution of the deed, there was no rupture to destroy the unity of title and sever the joint tenancy.

Next, Executrix maintains the lower courts "disregarded Pennsylvania's well-established presumption against joint tenancies with the right of survivorship." Appellant's Brief at 9. She emphasizes that we have previously held that joint tenancies are "not favored" under Pennsylvania law and that there is a statutory presumption against the creation of joint tenancies with the right of survivorship. *Id.* at 15 (*citing Pennsylvania Bank & Tr. Co. v. Thompson*, 247 A.2d 771, 771 (Pa. 1968); 68 P.S. § 110). From there, Executrix reasons that "[i]f joint tenancies are disfavored in this Commonwealth, the analytical framework to decide whether a joint tenancy terminated should start with the presumption that severance was achieved." *Id.* We decline to go that far. The presumption against joint tenancies relates to their creation. Their disfavored status merely reflects the historical change, discussed above, that has occurred: While joint tenancies were once the predominant form of concurrent ownership, that title now belongs to the tenancy in common.

Executrix further asserts there is "no logical reason for a distinction between the method used to create or sever a joint tenancy." Appellant's Brief at 16. We do not agree. Creating a joint tenancy **bestows** a right of survivorship on the tenants, while severing a joint tenancy takes that right away. While joint tenancies may be unilaterally created under some circumstances, one tenant in common could not unilaterally deprive a fellow

tenant in common of her ability to leave her share to others by secretly transforming the estate into a joint tenancy. This is because a tenant in common possesses only a separate fractional share in property, and thus would be incapable of conveying the undivided interest in the whole estate required for a joint tenancy. *See Craft*, 535 U.S. at 279-280.

Executrix also contends that requiring conveyance to a third party "will create unnecessary obstacles to real estate transfers." Appellant's Brief at 10. Executrix notes that in *Lafayette v. Brinham*, we held a grantor could create a joint tenancy with himself and another, and that "no 'straw man' was necessary." *Id.* at 17-18 (*citing Lafayette v. Brinham*, 69 A.2d 130, 132 (Pa. 1949)). As Executrix further observes, we reaffirmed *Lafayette* in *In re Estate of Plance*. *See id.* at 18 (*citing In re Est. of Plance*, 175 A.3d 249, 258 (Pa. 2017)).

Yet both cases are distinguishable. *Lafayette* involved the **creation**, not the severance, of a joint tenancy. There, the grantor, "in his 79th year, conveyed certain real estate … to himself and his step-son … as joint tenants with the right of survivorship." *Lafayette*, 69 A.2d at 130. The grantor later claimed he "improvidently executed the deed" while "recovering from a period of intoxication and did not know what he was doing[.]" *Id.* The lower court held the conveyance was ineffective because the four unities were not present in a self-conveyance. We disagreed, holding the four unities necessary for the creation of a joint tenancy were present, even though the property was not conveyed to both parties simultaneously through a straw man. *See id.* at 132. As with the presumption against joint tenancies, *Lafayette* relates to the creation, not the severance, of joint tenancies. And as explained above, there are reasons to treat creation and severance differently.

*Plance* is likewise distinguishable. There, we held that "[j]ust as one may grant property to oneself as a joint tenant …, one may use a single deed to transfer property to oneself as a trustee." *Plance*, 175 A.3d at 265. Thus, *Plance* involved the creation of land trusts and relied on the ability to **create** a joint tenancy by self-conveyance. It did not hold that joint tenants may sever a joint tenancy by self-conveyance. Nor did it establish that "Pennsylvania unequivocally recognizes the validity of real estate transfers by self-conveyance" as Executrix claims. Appellant's Brief at 18.

*B. Application to the Present Facts*

Returning to the facts of this case, while Mother manifested an intent to sever, she was able to retreat from severance precisely because the four unities of the joint tenancy remained undisturbed. The quitclaim deed was only capable of conveying the interest Mother already had. This means that when she conveyed her interest as a joint tenant with a right of survivorship directly to herself, nothing about her form of ownership changed. *See* Orth at 431-432. Nor was there any disruption of title, as she maintained her ownership before, during, and after the attempted conveyance. Similarly, because there was no interruption in her ownership, there was no change to the time that ownership began. Finally, the deed failed to alter possession as she always retained the right to possess the whole, undivided property. In sum, the deed failed to effectuate any real change. It is as though Mother jumped into the air and landed in the exact same spot.

Because Mother's self-conveyance *via* quitclaim deed failed to destroy any of the four constituent unities of the joint tenancy, her action was not "of sufficient manifestation that [she was] unable to retreat from [her] position of creating a severance of the joint tenancy." *Sheridan*, 149 A.2d at 446; *see also* Blackstone at *185 (explaining severance requires destruction of one of the four unities). In contrast, third-party conveyance would

have worked a severance. Had Mother conveyed her ownership to a third party, that third party would have acquired title by a different instrument, thereby destroying (at a minimum) the unity of title and transforming the joint tenancy into a tenancy in common. When the third party subsequently reconveyed ownership back to Mother, Mother's interest in the property would have accrued by a different conveyance and at a different time. In that case, the four unities would not have been present, and Mother and Son would have been tenants in common.

The approach we retain today takes the intent of the parties into account, while preserving the clear predictability provided by consideration of the four unities. This standard is consistent with Pennsylvania courts' application of the common law. Our courts have long explained that "[a]lthough the joint tenancy may be severed by a joint tenant's act which destroys one of the four unities, 'that act must be of sufficient manifestation that the actor is unable to retreat from the position of creating a severance of the joint tenancy.'" *Allison*, 481 A.2d at 1217 (*citing Sheridan*, 149 A.2d at 446); *see also Quick*, 905 A.2d at 475 (stressing the significance of intent when addressing severance of a joint tenancy, lest "unwary titleholders [ ] inadvertently undo that unity of title which they must purposefully create[,]" while simultaneously reiterating that a "joint tenancy is severed when one or more of the four unities is destroyed") (citation omitted). In holding that Mother's self-conveyance failed to sever the joint tenancy, we balance the "formalism involved in strictly applying the four unities" with the "salutary aim of effectuating the wishes of joint tenants[.]" *Quick*, 905 A.2d at 477 (Saylor, J., concurring).

## V. CONCLUSION

Mother's quitclaim deed conveying her interest in the property from herself as grantor to herself as grantee was not "of sufficient manifestation [such] that [she was] unable to retreat from the position of creating a severance[,]" *Sheridan*, 149 A.2d at 446,

precisely because she did not destroy any of the four unities that characterized the joint tenancy with right of survivorship. Accordingly, her action did not transform the estate into a tenancy in common. A quitclaim deed self-conveying a joint tenant's interest in property directly back to herself is insufficient to sever a joint tenancy. When a joint tenant manifests an intent to sever a joint tenancy, but does not destroy any of the four unities, the joint tenancy remains intact. The judgment of the Superior Court is affirmed.

Chief Justice Todd and Justices Donohue, Dougherty, Mundy and Brobson join the opinion.

Justice Wecht did not participate in the consideration or decision of this matter.